THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE ALLEN, Defendant-Appellant.

Fifth District No. 74-324

Opinion filed January 28, 1976.

Stephen P. Hurley and Michael J. Rosborough, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Bruce D. Irish and Myra J. Brown, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

A jury found the defendant-appellant, George Allen, guilty of murder and, following a sentencing hearing, the court imposed a 70- to 100-year sentence. The defendant has appealed.

There are five issues presented for review:

(1) Whether the court erred in tendering jury instructions;
(2) Whether the court erred by denying the defendant's request for a continuance to obtain new counsel;
(3) Whether the court erred in ruling on certain evidentiary matters;
(4) Whether the court erred in denying the defendant's motion for a new trial based upon newly discovered evidence;
(5) Whether the court should reduce the degree of the offense or the sentence imposed.

On July 23, 1971, an indictment was returned charging George Allen with the murder of Herman Reynolds. On February 6, 1974, the appellant was arrested. On May 21, 1974, the day appellant's trial was to begin, a pretrial discussion took place. The defendant moved for and was granted a substitution of judges. The next day the defendant sought to change lawyers as he alleged that his retained counsel wanted him to plead guilty. The court stated that it felt the sole reason for the request was to delay the trial, and denied the request. The court then ordered the jury selection to begin, and the trial commenced the next day.

The State's first witness was Verna Reynolds, mother of the deceased who identified a photograph of the deceased as her son. The prosecution's next witness, Ronald Barkowski, testified that on May 11, 1971, he was a desk clerk at the Villa East Motel in East St. Louis, Illinois. He identified the defendant and stated that he had been renting a room at the motel. He said that on the morning in question he heard two shots and saw the defendant standing in Room 120 firing at another man who was running away. He concluded by saying that he saw no weapon in the running man's hand.

Larry Vancil, an East St. Louis police officer who was passing the motel at the time, stopped to assist Reynolds. Vancil "patted down" the deceased both at the scene and at the hospital but discovered no weapon

on his person. Sandra White, the day clerk at the motel, said she heard a shot and saw a man running. She testified that she heard five shots in all, and identified the defendant as the man doing the shooting. The coroner of St. Clair County testified that four bullets passed completely through Reynolds' body, causing his death.

The defendant took the stand and testified that he was living at the Villa East Motel and that he met the deceased on May 9, 1971, at a tavern in East St. Louis, Illinois, when he and one "Swede" Jefferies threatened him. They told the defendant that they wanted "pay-off" money from him. The defendant further testified that he called Captain William Johnson of the East St. Louis Police Department on the morning of May 11 to report the threats made to him by the deceased and Jefferies. The defendant stated that he saw the deceased around the motel in the morning and that he knocked on his door, stating that Jefferies wanted to talk with him about money. During the conversation, the defendant testified that the deceased acted like he was going to get something out of his pocket, and the defendant shot him in the stomach and then continued pulling the trigger. The defendant then fled with Ernestine Johnson who was living in Room 120 at the motel. The accused said that he never learned of Reynold's death and that he began to shoot because he saw a gun coming out of the deceased's pocket.

On cross-examination the defendant stated that he fled because he was scared of the "War Lords." He admitted that Room 120 was for Ernestine Johnson who was a prostitute, but that she didn't conduct her business from the room. The defendant stated that he could be called a "pimp," but at one time he had an interest in a tavern and dry cleaning establishment. He testified that the deceased thought he had a lot of money because he had a Cadillac and the statement was made that he "had girls." The defendant said he knew the deceased was coming after him because the girls had told him. He also told of calling Captain Johnson about the threats and that his two "girl friends" had been raped by the deceased. The defendant stated that he did not know how many shots he fired, but did reload his gun.

On redirect examination, the defendant testified that Sergeant Pool of the St. Clair County Sheriff's Department told him that the deceased had spent some time for rape.

Captain William Johnson of the East St. Louis Police Department testified that the defendant had called him early on the morning of May 11. The defendant recounted that the deceased had raped two of his women and threatened them and him. The threats were communicated through the girls. On cross-examination Johnson stated that the defendant did not tell him that he was threatened directly by the deceased. Johnson

also told of a phone conversation that he had with the defendant after the shooting and he advised the defendant to surrender.

After the defendant's mother testified, the last witness for the defense was Sergeant Pool, from the sheriff's office. The prosecution objected to Pool's testifying. The defense made an offer of proof that the deceased had threatened Pool's sister, Gloria. The court denied the offer of proof on the grounds that Gloria Pool had not been mentioned in the case.

After the defense rested, the State called Captain Johnson as a rebuttal witness. He testified that he did not know whether the deceased or Jefferies had ever been tried or convicted of rape. Sergeant Pool also testified on rebuttal that he never told the defendant that the deceased had been imprisoned for rape.

The defendant moved for a continuance so that Ernestine Johnson could travel from Cleveland, Ohio, to testify as a defense witness. The court denied the motion on the grounds that the case had been set for trial for eleven days and that the evidence would be cumulative.

At the instruction conference, the defense objected to People's instructions 7 and 8, the "issues" instructions, as they were the same instructions except that the decedent's name appeared in the last two paragraphs of number seven. The objection was overruled. At the instruction conference, the defendant himself went on record as being opposed to the submission of any instruction on voluntary manslaughter. He acknowledged that he understood the differences between murder and manslaughter, as well as the differences in the possible penalties.

The jury returned a verdict finding the defendant guilty of murder.

On July 12, 1974, the defendant's motion for new trial was heard. Included in this motion was a supplemental motion on the grounds of newly discovered evidence. The court heard testimony from the defense on the motion for new trial. The first witness called was Verna Reynolds, the deceased's mother, who denied seeing one Alvin Tolden at the hospital when her son was admitted because of the shooting. Tolden testified that he had gone to the hospital when he heard of the incident on the radio in his car. He stated that he saw a .25-caliber automatic taken from the deceased's pocket and placed on a stand. On cross-examination the witness admitted that he was a suspended police officer and had previously worked for the defense attorney.

The court denied the motion for new trial and on July 31, 1974, the court considered a presentence report and then imposed a 70- to 100-year sentence.

■■ The defendant's initial contention is that the trial court erred by failing to tender, *sua sponte*, an "issues" instruction which informed the jury that the State had the burden to overcome any evidence of self-

defense beyond a reasonable doubt in order to convict the defendant of the crime charged. The defendant, however, did not tender such an instruction. If an accused wishes certain instructions to be given, he should offer them and request the court to give them, since the trial court is under no duty to give instructions on its own motion. (*People v. Meeks*, 11 Ill.App.3d 973.) It has long been held that the jury is properly instructed if the series of instructions, construed as a whole, fully and properly informs the jury of the law applicable to the case. (*People v. Turner*, 82 Ill.App.2d 10.) In the instant set of instructions, the jury was given IPI 7.02 (burden of proof of murder, without mention of self-defense), 24.06 (justifiable use of force); and IPI 2.03 (presumption of innocence, including the State's burden of proving the defendant guilty beyond a reasonable doubt and the defendant not being required to prove his innocence). This series construed together sufficiently informed the jury of the law applicable to the defendant's theory of defense, self-defense, and of the State's burden of proof. Had the defendant tendered IPI 25.05 the court would have been under a duty to give the instruction. In the absence of such a request, however, the instruction which the court did give provided an adequate guide for the jury.

██ On the instruction question, the defendant next contends that the trial court, having submitted an instruction on self-defense, should have submitted an instruction on voluntary manslaughter. When the evidence in a murder case would support a verdict of manslaughter, and the defendant does not request a manslaughter instruction, the giving of such instruction is left to the discretion of the trial judge. (*People v. Taylor*, 36 Ill.2d 483.) The defendant himself went on record opposing such an instruction. He reaffirmed this decision even after an explanation of the differences in penalties between murder and manslaughter. Obviously, the defendant did not want the jury to consider a "compromise" verdict. Accordingly, the judge did not abuse his discretion by failing to tender, *sua sponte*, an instruction on voluntary manslaughter.

██ Whether the court erred in refusing to grant defendant's request for continuance to obtain new counsel is defendant's third contention in asking for a reversal. The granting of a continuance for substitution of counsel is a matter resting within the sound discretion of the trial court. (*People v. Hart*, 10 Ill.App.3d 857.) A conviction will not be reversed because of the denial of such motion unless it appears that the refusal of additional time in some manner embarrassed the accused in preparing his defense and prejudiced his rights. (*People v. Solomon*, 24 Ill.2d 586.) In the instant case, the defendant asked for a continuance to obtain new counsel on the day the jury selection was scheduled to begin. The day before he asked for a substitution of judges which was granted and

also asked for a continuance to contact a prospective witness which was not granted.

The defendant apparently desired to change counsel because he felt his retained counsel wanted him to plead guilty. The defendant admitted his attorney was competent, and he made no showing that he and his counsel could not cooperate. Counsel had been retained by the defendant at his arraignment which was over three months before trial. The trial judge properly determined that the sole reason for the request was to delay the trial. The court did not err in denying the defendant's request for a continuance.

■■ The defendant's fourth contention is that the court committed reversible error in three instances during the trial. The first instance was when Sergeant Pool was not allowed to testify to threats made by the deceased to his sister, Gloria Pool. The testimony of Sergeant Pool in regards to threats made to his sister is irrelevant to the question whether threats made to the defendant by the deceased is thus inadmissible. It is fundamental that witnesses may testify to the deceased's reputation as a violent man, but not to specific instances not involving the defendant. (*People v. Peeler*, 12 Ill.App.3d 940.) The trial judge correctly excluded the testimony of a threat made to the witness' sister by the deceased.

■■ Another contention of the defendant is that the trial court improperly limited the cross-examination of Sergeant Pool when the State called him as a rebuttal witness. Restriction of the scope of cross-examination rests within the discretion of the trial judge. (*People v. Mason*, 28 Ill.2d 396.) When called as a State rebuttal witness, Pool denied telling the defendant that the deceased had been imprisoned for rape. The defense attempted to elicit testimony that Pool had actually told the defendant that the deceased had been imprisoned for burglary. The trial judge correctly refused this testimony on the grounds that it was irrelevant.

■■ The defendant's third alleged error in the conduct of the trial was that a continuance should have been granted to obtain a defense witness. The record indicates that the defendant sought a continuance on the last day of trial to contact Ernestine Johnson who lived in Cleveland, Ohio. Yet the record does not indicate a previous attempt by the defendant to get in touch with the prospective witness. The defendant asked the court to continue the trial from Friday noon until the following Tuesday without any real assurance that the witness would in fact be present on Tuesday to testify. The granting of a continuance rests within the discretion of the trial judge, and again the court did not abuse its discretion by denying this request for a continuance.

■■ The defendant's fourth contention is that the court erred by denying his motion for a new trial based on newly discovered evidence. To

warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Holtzman*, 1 Ill.2d 562.) The "newly discovered" evidence consisted of testimony from one Alvin Tolden, a suspended police officer who offered to testify if he were called as a witness at the new trial he would state that he was present when the deceased was admitted to the hospital and saw a gun removed from the deceased. The deceased's mother denied seeing Tolden at the hospital, although she had known Tolden all of his life. The evidence would have been material, but it was not of such conclusive character that it would probably change the result of the trial. In addition, the defendant makes no showing why this evidence could not have been discovered prior to trial. The trial court properly denied the request for a new trial.

The defendant's final contention is that his conviction should be reduced to the lesser included crime of voluntary manslaughter, or, in the alternative, his sentence should be reduced. The defendant cites *People v. Vaughn*, 26 Ill.App.3d 247, as authority to support his contention on reduction of the degree of the offense. In *Vaughn* there was vigorous evidence that the defendant had been beaten by the victim minutes before the shooting and was justified in believing that the deceased was coming after him again.

■■ The sole evidence that the defendant acted in self-defense came from the defendant himself. Although the defendant did telephone Captain Johnson and report the alleged rapes on the defendant's "girls," Johnson denied that the defendant mentioned any threats on his life. At the shooting on May 11, 1971, the defendant shot the deceased in the stomach and continued firing at him as the wounded man was running away. The defendant admitted reloading his gun to continue firing. This evidence belies any claim that the defendant was acting in a reasonable belief of self-defense. The evidence was sufficient to find the defendant guilty of murder beyond a reasonable doubt.

■■ A true indeterminate sentence is one with a sufficient difference between the minimum and maximum limit which will allow the prisoner an opportunity for parole. (*People v. Jacque*, 131 Ill.App.2d 365.) In this case the nature of the offense, as well as the defendant's long prior record, justifies a sentence higher than the statutory minimum. In *People v. Scott*, 117 Ill.App.2d 344, the court stated:

> "The minimum sentence measures parole eligibility. The maximum sentence measures the length of time that the inmate may

be incarcerated, even without favorable parole consideration. When there is a substantial spread between the minimum and the maximum of a sentence the inmate in the institution can be directed toward academic or vocational training, and favorable prospective parole consideration operates as quite a catalyst. The existence of a substantial spread between the minimum and the maximum ensures the availability to the defendant of supervision after incarceration. The principle of indeterminacy of sentence necessarily leaves to the professionals in the behavioral sciences the determination of the optimum date for release. The court, in fixing the maximum, determines the total length of possible incarceration." 117 Ill.App.2d 344, 350.

The defendant was 49 years old at the time of sentencing. The sentence of the defendant is therefore reduced to a minimum of 33 years and a maximum of 100 years.

Judgment affirmed as modified.

EBERSPACHER and G. J. MORAN, JJ., concur.