THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY LEE HUGHES, Defendant-Appellant.

Fifth District   No. 81—16

Opinion filed September 22, 1982.

Randy E. Blue and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert W. Matoush, State's Attorney, of Salem (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Larry Lee Hughes, was charged by information with the murder of Kevin Queen. Defendant was initially tried in September 1980, but a mistrial was declared due to the jury's failure to reach a verdict. At a second trial, held in late October 1980, the jury found defendant guilty of the offense of murder and he was sentenced to 24 years' imprisonment. On appeal defendant raises the following issues: (1) whether the trial court erred by not instructing the jury *sua sponte* regarding voluntary manslaughter and self-defense; and (2) whether this cause must be remanded for resentencing because the trial court considered, as an aggravating factor in imposing sentence, that defendant's conduct caused or threatened serious bodily harm to the deceased.

The State called Richard Simer of the Centralia police department as a witness for the purpose of identifying photographs of the deceased and Jim's Tavern, which is located on McCord Street in

354

Centralia, Illinois.

Rance Ryan testified that while he was tending bar at Jim's Tavern during the early morning hours of May 31, 1980, four young, black males came in. One of the four black youths approached the bar and ordered a six-pack of beer. Mr. Ryan identified this individual as the defendant and said that he was wearing a black vest, a large brimmed hat and a gold earring in his left ear. Mr. Ryan stated that he had never seen defendant before but recognized the other three black males whom he identified as Daniel Franklin, William Glenn, and Bert Cunningham. Mr. Ryan testified that Mr. Glenn wore a red jacket with his name on the back and that Mr. Franklin wore a light tan jacket and a black beret. Mr. Ryan could not recall Mr. Cunningham's apparel.

Mr. Ryan asked defendant for identification because he believed him to be underage. Defendant produced an outdated driver's permit and Mr. Ryan refused to serve him liquor. Defendant became perturbed and persisted in his request for beer. Mr. Ryan refused to discuss the matter further and he turned his back on defendant.

Subsequently, Mr. Ryan heard some noise at the back of the tavern and he turned and saw a large number of people running out the back door. Mr. Ryan went to the back door to investigate and as he stepped outside, he observed defendant across the alley with a gun in his hand. Defendant was about 12 to 14 feet away and the area was illuminated by a street lamp and three lights on the exterior of the tavern. Defendant fired two shots in the direction of Mr. Ryan and Greg Campbell, a patron of the tavern who was standing near Mr. Ryan. Mr. Ryan saw Mr. Franklin and Mr. Cunningham behind defendant but did not see Mr. Glenn. After firing the shots, defendant ran around the corner out of Mr. Ryan's view. Almost immediately, Mr. Ryan heard two more gun shots. He ran around the corner and saw Kevin Queen lying on the sidewalk. Mr. Ryan turned Mr. Queen over and noticed a hole in his shirt with blood around it.

Greg Campbell testified that he was in the tavern when the four young, black males came in. He said that defendant wore a gold earring in his left ear, dark clothes, and a black felt hat with a brim. After the bartender refused to serve the four youths, they became angry. As they were leaving, Mr. Campbell's mother walked in. Defendant, at the time, was "cussing pretty bad" and Mr. Campbell's mother told him to watch his language. In response, defendant swore at the woman. Kevin Queen and others ran out after defendant. Greg Campbell stated that outside the tavern in the illumination of the street lamp and tavern lights he observed defendant running along

the alley about 15 to 20 feet away. Defendant turned and fired two shots at Mr. Campbell and Mr. Ryan. Defendant kept running and a moment later Greg Campbell heard two more shots. When Greg Campbell reached the sidewalk, he saw Mr. Queen lying on the ground.

On cross-examination, Greg Campbell testified that of the four young blacks he knew only William Glenn prior to the incident. He said that Mr. Glenn wore a red jacket and possibly a dark hat. Greg Campbell denied that it was Mr. Glenn who shot at him and Mr. Ryan.

Rick Campbell, Greg's brother, testified that he, his wife Lisa, and his father were outside Jim's Tavern when the four young blacks arrived. Sometime later, he heard a shot and saw defendant, who was wearing dark clothes, a black hat with a brim, and an earring in his left ear, running with Mr. Queen close behind him. Defendant fired a second shot and then ran around the corner followed by Mr. Queen. Rick Campbell ran to the corner and saw defendant turn around and shoot Mr. Queen, who was four or five feet from defendant at the time. Defendant turned back around and then ran away. Rick Campbell said he had a clear view of the shooting, that there was sufficient street lighting to enable him to see defendant, and that he saw defendant's face in the flash of the gun. He estimated that at the time the shooting occurred, he was approximately 20 feet from the defendant. Rick Campbell said he never saw a black man with a red jacket in the area of the shooting and that he had mistakenly told police that the gunman's name was Daniel Franklin.

James Roberts, a forensic scientist, testified that he had examined the shirt and pants worn by Mr. Queen and concluded that because there was no gunpowder residue on them, the gun was probably not fired from extremely close range.

Lisa Campbell testified that she saw three black males enter the tavern. She heard some commotion and saw some people running. She heard a gunshot and saw flames from a second discharge of the gun. She caught a glimpse of the gunman, who was standing in the alley pointing his weapon toward the rear door of the tavern. She could not positively identify the man she observed but remembered that he was wearing dark clothing. Mrs. Campbell said that she knew both Mr. Glenn and Mr. Franklin and neither of these individuals was the gunman.

Karl Wilson testified that he was in the tavern when the four black youths entered. He recalled that defendant was wearing a black shirt, dark pants, a black wide-billed hat and an earring in his left ear and that defendant presented identification to Mr. Ryan. As the four

youths were departing, Rick Campbell's mother told them not to use profanity. When one of the black youths responded by calling Mrs. Campbell a name, Mr. Wilson and others jumped up and pursued the four black youths out the back door. As soon as he got outside, Mr. Wilson heard shots. Mr. Wilson said he ran toward the corner of the alley and McCord Street and while doing so heard one or two more shots. When he rounded the corner, he saw Mr. Queen lying on the ground.

Bert Cunningham testified that he, Mr. Glenn, Mr. Franklin and defendant were leaving through the back door of Jim's Tavern after defendant was unable to get served when Mr. Glenn began arguing with a woman. When they got outside, some white people came out of the tavern and started chasing them. Mr. Cunningham and Mr. Franklin headed toward the corner of the alley. Mr. Cunningham heard defendant tell someone to "get back" and then heard some shots. Both Mr. Cunningham and Mr. Franklin got down on the ground until the shooting stopped. When Mr. Cunningham got up he saw a man lying on the sidewalk. Some white people came from the alley and accused Mr. Cunningham and Mr. Franklin of the shooting so they ran away. Mr. Cunningham stated that he could not say where Mr. Glenn was at the time of the shooting.

Daniel Franklin testified that as he and the other black youths were leaving Jim's Tavern, Mr. Glenn called a woman a bitch and four or five white men jumped over the tables and began chasing them. Mr. Franklin heard a shot and when he got outside, he saw defendant being chased by some white men. Defendant shot into the air and a number of white men retreated, but Mr. Queen continued to pursue defendant. Defendant fired two shots and Mr. Queen fell to the ground. After Mr. Franklin saw Mr. Queen fall, he and Mr. Cunningham ran away. Mr. Franklin said that Mr. Glenn wore a red sweatjacket with his name on the back and, perhaps, a baseball cap. He said defendant wore black clothing and a round derby hat.

Cletus Feig, a Centralia police officer, testified that he was called to the vicinity of Jim's Tavern the morning of May 31 and found Mr. Queen lying on the sidewalk on McCord Street. Mr. Queen did not speak but appeared to be conscious.

Dr. Gordon Johnson, a medical doctor and pathologist, testified that he performed an autopsy on Mr. Queen's body. He said that the cause of death was loss of blood caused by a gunshot wound in Mr. Queen's chest. He also testified that there was a bullet wound in Mr. Queen's right thigh.

Roger Campbell, one of the ambulance personnel, testified on be-

half of defendant. He said Mr. Queen was conscious when he was placed in the ambulance and complained of pain a number of times. According to Mr. Campbell, while in the emergency room at St. Mary's Hospital, Mr. Queen said that it was Mr. Glenn who had shot him and that Mr. Glenn was wearing a red shirt.

Jim Brown, an emergency medical technician, also testified for the defense. He accompanied Roger Campbell in the ambulance and corroborated his testimony. According to Mr. Brown, at the hospital Mr. Queen stated that "the young Glenn boy in the red shirt" was the person who shot him.

In rebuttal, Dr. Pedro T. Durian, the emergency room physician who treated Mr. Queen at St. Mary's Hospital, testified that when Mr. Queen arrived he was semi-comatose, had virtually no blood pressure, and was in a state of "profound shock." Dr. Durian said that a person in this condition would likely be confused and have impaired memory.

Officer Feig was recalled by the State and testified that he spoke with Mr. Queen at the emergency room in St. Mary's Hospital. According to Officer Feig, Mr. Queen seemed to be babbling and was kind of glassy eyed, "kind of like a person that was intoxicated."

At the initial instructions conference, the trial court asked whether the defense wanted an instruction on voluntary manslaughter. The trial court noted that at defendant's first trial a discussion was had as to whether a voluntary manslaughter instruction should be given and that defendant elected to submit the case to the jury without such an instruction. When the trial court inquired as to whether the defense wished such an instruction to be given at the instant trial, defense counsel responded that he and defendant had discussed the matter several times but had not, at that time, reached a decision. Subsequently, the following colloquy occurred:

"THE COURT: All right I will show that we are having a further instruction conference outside the presence of the jury at the conclusion of all the testimony and after a denial of the Motion for Directed Verdict, at the close of the evidence. Mr. Becker, have you had a further consultation with your client, the Defendant, relative to the instructions as to the offense of manslaughter and the verdict form as to manslaughter?

MR. BECKER [defense counsel]: Your Honor, the defendant and I have gone over that, and I have told the Defendant what penalties for voluntary and involuntary manslaughter are. We have discussed whether or not they should be tendered, and what effect they would have if they are tendered; particularly the fact that it would give the jury an opportunity, if they so

chose, to find him guilty of a lesser included offense with a lesser penalty. I think the defendant knows what those penalties are.

I have the instructions prepared. They could be tendered if he so chose. We talked about it, and I told him what I thought about the case, and we talked about it at the last case and decided not to do it, and I believe he has decided not to do it this time.

THE COURT: Is that correct, Mr. Hughes?

MR. HUGHES: Yes.

THE COURT: All right, so that there is no misunderstanding, what your attorney is suggesting is that the jury be instructed as to the criminal offense of murder only and that they be given only two forms of verdict; one guilty of murder, one not guilty of murder. Now is that your understanding?

MR. HUGHES: Yes.

THE COURT: Now the penalty for murder is substantially higher than that of manslaughter. The penalty for murder in the event of your being found guilty, your conviction, could be for a term of years not less than 20 nor more than 40 for a fixed and determinate number of years between 20 and 40 with 40 being the maximum. It could be for your natural life, do you understand that?

MR. HUGHES: Yes.

THE COURT: Now the penalty for voluntary manslaughter; voluntary manslaughter is a Class-2 felony, and in the event of your being found guilty and convicted of the offense of voluntary manslaughter, you could be sentenced to a period of imprisonment in the penitentiary for not less than three (3) or more than seven (7) years for a fixed and determinate number of years between three (3) and seven (7), with seven (7) being the maximum. Do you understand that?

MR. HUGHES: Yes.

* * *

THE COURT: all right, now if you go to the jury, as is being suggested by your attorney at this time, then you are either saying to the jury, you are either finding me guilty of murder or finding me guilty of nothing. Do you understand that?

MR. HUGHES: Yes.

THE COURT: Now if you would tender to me, and I would offer to the jury, instructions on voluntary manslaughter, and for that matter involuntary manslaughter, then the jury would

have the option of finding you not guilty of all three offenses or finding you not guilty of murder but guilty of voluntary manslaughter or involuntary manslaughter; do you understand?

MR. HUGHES: Yes.

THE COURT: Now I am sure you have discussed this with your attorney, and he has discussed it with you; if you submit to the jury instructions other than murder, meaning voluntary manslaughter or involuntary manslaughter, then you do give them an option and a choice, and it might make it more easy for them to come in with a verdict of guilty. However, if you submit to them only an instruction on murder and a verdict on murder, verdict form on murder, then you are going for broke. You are either going to be found guilty of murder or you are going to found not guilty of anything. Do you understand that?

MR. HUGHES: Yes.

THE COURT: Now I presume that is exactly what you have discussed with him, is that right, Mr. Becker?

MR. BECKER: That is correct, Your Honor.

THE COURT: Now do you have any question about that?

MR. HUGHES: No.

THE COURT: I can tell you if you offered me an instruction and a verdict form on voluntary manslaughter, I would give it. I think that under the testimony that certainly there is evidence that you were being chased, that you were not the aggressor. If you were, in fact, the assailant as claimed by the State, that you were not the aggressor, that you were being chased. You are a young black person, you were being chased by several white persons who had come out of the tavern, had been drinking; and you would be entitled to an instruction as to the right of self-defense; and I would give such an instruction if you so requested.

Now it is my understanding of the law that if you do not submit such an instruction then it would not be error for one not to be given; however, it is my further understanding of the law that if I believe that the evidence is such that the trier of fact could find you guilty of either murder or manslaughter, then I have a right to give it over your objection, except in such cases as where the defense of the defendant is either alibi or mistaken identity. Then you have a right to refuse such an instruction. In this case it appears to the Court that your defense, of course, is a question of mistaken identity; that you were not the one, that it was another individual who committed this act, and for that

reason I will not give the instruction over your objection, but I will give it if you request it. Do you understand what I have said?

MR. HUGHES: Yes.

THE COURT: Now do you want to discuss this with your attorney anymore before you finally decide? Do you want to take a minute and talk with him, Mr. Becker, in view of the things I have said and see if there is any change in his position?

MR. BECKER: If you have any questions about anything, now is the time to ask me or the State's Attorney, the Court Reporter, the Clerk or anybody. If you have a question now is the time to ask it. If you want to talk to me some more I will talk to you.

THE COURT: You can talk outside our presence. All right, let the record show that the defendant is present. Since my last conversation with the defendant he has gone outside the presence of the Court and had a further discussion with his attorney, Mr. Becker.

MR. BECKER: Your Honor, the defendant has advised me that he still wants to proceed with the two forms of verdict, either guilty of murder or not guilty of murder.

THE COURT: He does not wish to have any instruction on manslaughter?

MR. BECKER: That is correct, and the substance of our conversation, for the record, had to deal with what effect giving the voluntary or involuntary manslaughter instruction, if the Court would see fit to give the involuntary manslaughter instruction, would have with respect to our defense of mistaken identity.

THE COURT: All right, now that is your decision, Mr. Hughes?

MR. HUGHES: Yes.

THE COURT: Do you simply want to present two forms of verdict, either guilty or not guilty of murder?

MR. HUGHES: Yes."

Defense counsel's closing argument presented a mistaken identity defense. Defendant tendered no instruction on either voluntary manslaughter or self-defense and the trial court did not instruct the jury *sua sponte* on these matters. The jury found defendant guilty of murder.

A sentencing hearing was had on December 12, 1980. In sentencing defendant, the trial court mentioned the following aggravating circumstances: (1) defendant's conduct caused and threatened serious

harm to Mr. Queen; (2) defendant had a history of prior delinquency in the form of one theft conviction and two burglary convictions; (3) the sentence was necessary to deter others; and (4) defendant was carrying a concealed weapon and took deliberate aim when he shot Mr. Queen. In mitigation, the trial court noted that there was some provocation and that this tended to excuse or justify the defendant's actions. Defendant was sentenced to imprisonment for a term of 24 years.

Defendant first urges that the trial court erred by failing to instruct the jury *sua sponte* concerning the lesser offense of voluntary manslaughter and the affirmative defense of self-defense. We reject these contentions.

■■ ■ Where, as here, the evidence in a murder case would support a verdict of manslaughter but the defendant does not request a manslaughter instruction, it is within the trial court's discretion whether or not to give such an instruction. (*People v. Taylor* (1967), 36 Ill. 2d 483, 489-92, 224 N.E.2d 266, 270-71.) We find *Taylor* dispositive of defendant's contention that the trial court erred by failing to instruct on the issue of voluntary manslaughter. As in *Taylor*, the defense chose not to request a voluntary manslaughter instruction. The trial court conducted a very detailed inquiry as to whether the defense desired a voluntary manslaughter instruction and both defense counsel and defendant informed the trial court that no such instruction would be tendered. The defendant, having elected to defend on the basis of mistaken identity, had a right not to have the jury instructed as to manslaughter. (36 Ill. 2d 483, 489, 224 N.E.2d 266, 270.) We hold that it was not error for the trial court not to give a voluntary manslaughter instruction on its own initiative. *People v. Allen* (1976), 35 Ill. App. 3d 342, 346-47, 341 N.E.2d 431, 435.

Parenthetically, compared with the numerous reported cases in which this issue has been considered, the instant case appears most clearly to depict the dilemma confronting the trial judge in determining whether a voluntary manslaughter instruction should be given. Here, the defendant, while maintaining throughout the trial that he was innocent, is heard to complain in a court of review that his killing of the decedent amounted to less than murder and that it was error not to instruct the jury *sua sponte* as to the elements of the lesser offense and to provide a verdict form to enable the jury to return a finding of guilty on the lesser offense. Adding to the court's dilemma is the fact that defendant's first trial had resulted in a mistrial because the jury was unable to agree on a verdict. The record indicates that the trial court, recognizing the dilemma confronting it, quite ca-

pably admonished defendant as to the choices available to the defense, permitted the defendant to make his choice, and as a consequence did not deprive defendant of his independent strategy decision. In this regard, it seems a certainty that defendant would have urged that he was deprived of his defense had the court given the voluntary manslaughter instruction and forms of verdict *sua sponte* and had defendant been convicted of that offense. We conclude that the trial court in the case at bar gave the defendant precisely what the record establishes he bargained for.

■■■ Defendant alternatively contends that the trial court erred by not instructing the jury *sua sponte* on the issue of self-defense. The defendant's failure to present the self-defense issue to the trial court and to tender instructions concerning such a theory constitutes a waiver of the issue. (*People v. Worsham* (1975), 26 Ill. App. 3d 767, 771-72, 326 N.E.2d 134, 137-38; *People v. Martin* (1977), 46 Ill. App. 3d 943, 955, 361 N.E.2d 595, 603; see *People v. Huckstead* (1982), 91 Ill. 2d 536.) We are not persuaded by defendant's argument that the failure to instruct the jury *sua sponte* as to self-defense amounts to plain error. As our supreme court recently observed in *People v. Huckstead*, the plain error exception to the waiver rule is limited to situations where "grave error" has been committed or the case is "factually close." (91 Ill. 2d 536, 545-46.) Neither of these tests is satisfied in the instant case. Defendant chose to defend on the basis of mistaken identity and, hence, elected not to instruct the jury on self-defense. We cannot say that it was "grave error" for the trial court to comply with defendant's desire not to instruct the jury on self-defense. Indeed, had the trial court done so, it would have compromised the defense based on mistaken identity because self-defense assumes that defendant committed the act for which he is being tried. (See *People v. Lahori* (1973), 13 Ill. App. 3d 572, 577, 300 N.E.2d 761, 764-65.) Additionally, we find that the case at bar is not "factually close" regarding the issue of self-defense. To justify the use of deadly force the defendant must have a reasonable belief that the action was necessary to prevent imminent death or great bodily harm. (Ill. Rev. Stat. 1981, ch. 38, par. 7—1.) The only evidence which would support a conclusion that defendant had a reasonable belief that deadly force was necessary is the fact that Mr. Queen was chasing him. Mr. Queen had not injured defendant nor did he threaten him prior to the shooting. Moreover, Mr. Queen was alone and unarmed when he was shot. There is very little evidence that defendant's actions were justified on the basis of self-defense and no close factual question was presented.

■ Defendant also contends that the trial court improperly considered, as a factor in aggravation, that defendant's conduct caused or threatened serious bodily harm to Mr. Queen because such factor is necessarily present in every murder. The State argues, *inter alia*, that it is not impermissible for the trial court to consider the force employed and the physical manner in which the victim's death was brought about. (*People v. Andrews* (1982), 105 Ill. App. 3d 1109, 1112-13, 435 N.E.2d 706, 708.) We agree with the State and, following our analysis and decision in *Andrews*, find that the trial court committed no error. In rendering sentence, the trial court noted that defendant carried a gun, took deliberate aim at Mr. Queen and fired two shots. These considerations lend support to its conclusion that defendant intentionally caused or threatened serious harm to Mr. Queen.

For the foregoing reasons, the judgment of the circuit court of Marion County is affirmed.

Affirmed.

JONES and HARRISON, JJ., concur.