THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD JONES, Defendant-Appellant.

Second District    No. 84—0391

Opinion filed January 30, 1986.

Kenneth L. Jones and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

Defendant, Donald Jones, was convicted at a bench trial of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)) and sentenced to a term of natural life imprisonment. He appeals, contending (1) that the conviction of murder should be reduced to involuntary manslaughter, (2) that the trial court improperly admitted hearsay and irrelevant evidence, and (3) that his sentence of natural life imprisonment should be reduced because it is excessive given the circumstances, and because the trial court improperly considered certain factors in aggravation and improperly ignored certain mitigating factors.

The victim in this case was a four-year-old boy named Dennis Carson. He was the son of defendant's girlfriend, Jessica Carson. Defend-

ant, Jessica, and Dennis resided together in an apartment in North Chicago.

Dennis died as a result of injuries he sustained during an automobile ride he took with defendant on the morning of October 30, 1983. Dr. Larry Blum, the pathologist who performed the autopsy on Dennis at about 7 p.m. that day, testified that the child was 40½ inches tall and weighed about 40 pounds. He said that during his external examination he observed multiple blunt trauma injuries. There were three bruises on the child's forehead. There was a bruise accompanied by an abrasion in the child's "left eye region," and a bruise over the right eyebrow. There was an abrasion on the child's left cheek, and three bruises on the right side of the face "in the cheek area and the chin area." There was a laceration on the child's lower lip. Dr. Blum stated that he opened the child's mouth and observed that the frenulum, which is "tissue going straight up from the lip *** up above the two front teeth," was torn and bruised. There were abrasions "of both ears towards the back" and two bruises on the neck. Dr. Blum described seven bruises that he observed on the child's chest, and a bruise and several abrasions on the abdomen. The child's left arm showed four separate bruises, and there was a bruise on the left wrist as well as an abrasion on the left hand. There was a bruise on the right side of the groin and a "tearing of the skin right above and slightly to the right of the penis." The underside and the side of the penis showed some swelling, and the underside showed an abrasion. There were also bruises over both knees. There were "numerous" bruises on the child's back, and two bruises on the right buttock. There was an "abrasion-contusion" injury in the upper part of the left thigh. Dr. Blum testified that most of these bruises were of recent origin, *i.e.*, they were caused within a day or day and a half prior to his examination.

Dr. Blum stated that the child's abdomen and the right half of his scrotum were distended. Internal examination revealed that this swelling was caused by free air in the abdomen. Dr. Blum determined that this air had leaked into the abdominal cavity from a rupture in the small intestine. Dr. Blum testified that in addition to the air, there was free blood in the abdomen. He determined that this condition was caused by a rupture of blood vessels in the mesentery, which is a fat and fibrous tissue from which the intestines get their blood supply. The amount of free blood in the abdomen was about half of the blood in the child's body. Dr. Blum stated that anyone who loses more than a third of his blood, either internally or externally, is liable to die of shock. Dr. Blum stated that the amount of time required for the air

and blood to accumulate in the abdomen would have been between 3 to 14 hours. There were also hemorrhage about the right kidney, the duodenum, the adrenal gland, and on the outside covering of the stomach. There was also a small hemorrhage in the liver. Dr. Blum stated that the internal injuries were probably caused by an object pushing the abdomen in and out quickly. Finally, Dr. Blum gave his opinion that the cause of Dennis' death was blunt trauma.

Dr. Paul Kineberger, a pediatrician, who reviewed the medical reports in this case, concluded that there had been more than one blow to the child's abdomen.

Defendant gave a statement to Officer Phelps of the North Chicago police department at about 7 p.m. on the date in question. Phelps asked defendant what he knew about the bruises on Dennis' body, and defendant replied that he knew about the bruises on the boy's mouth and buttocks because he (defendant) put them there. Defendant told Phelps that the incident occurred shortly after 6:30 a.m. while he was driving his car from the residence of Brian and Tammy Weekley in Zion to his girlfriend's place of employment, an establishment in Park City called Blue Suede Shoes. Defendant was on his way to pick up his girlfriend from work. When defendant and Dennis got into the car at the Weekley's, Dennis urinated in his pants. Defendant made Dennis sit in the urine. Defendant told Phelps that the child began ranting and raving, jumping up and down, and grabbing items off of the dashboard. At one point Dennis' jumping around almost caused him to drive off the road. Defendant told Phelps that during this tantrum he "backhanded" the child 5 or 10 times. Defendant told Phelps that he became angry and tried to make Dennis sit down. On one occasion, Dennis began to go into the back seat, and defendant pulled him back into the front and hit him some more. By the time they arrived at Blue Suede Shoes, Dennis was lying down in the back seat. Jessica came out to the car. Defendant told her that he and Dennis had "had a good one that night." Jessica stated that because of the change to central standard time she would not be finished with work for another hour.

Defendant told Phelps that he drove Dennis home, carried him up to the apartment and laid him on the couch. About an hour later, defendant picked Jessica up from work and drove her home. When they arrived, Dennis was asleep on the couch. Defendant and Jessica then went to sleep. Defendant got up in the afternoon, and he discussed with Jessica "getting some help *** because the child had been throwing fits and they was [sic] wondering where—what the problem was, and punishing the child." During this conversation,

defendant went into the living room to get a cigarette and saw Dennis lying on the couch with his eyes rolled back. Defendant determined that the child was not breathing, and defendant administered mouth-to-mouth resuscitation. Jessica called an ambulance. Defendant told Phelps that a short time later the paramedics arrived. After giving Phelps this statement, defendant made a tape-recorded statement about the incident. The tape recording was played to the trial court, but the record on appeal does not include the tape recording or a transcription of it.

The paramedics who responded to Jessica's telephone call also testified for the State. They testified that they received the call at about 4:10 p.m. on the date in question. They testified that when they arrived at the apartment, defendant was administering CPR to the child. They also described their unsuccessful attempts to revive the child.

Brian and Tammy Weekley also testified. They indicated that defendant and Dennis had spent the night of October 29-30, 1983, at their home. Dennis went to sleep about 10 p.m. and got up at about 6:30 the next morning. Defendant stayed up all night, playing cards and visiting. The Weekleys stated that during the course of the night defendant drank about six beers and four vodkas.

Jessica Carson testified that defendant drove her to work at 8 p.m. on October 29, 1983. Dennis was in the car. Jessica testified that she saw no bruises on Dennis at that time. When defendant and Dennis arrived to pick her up the next morning, she could not see Dennis clearly. He was in the back seat, and it was dark outside.

An hour later defendant came back alone to pick her up. When they got back to the apartment, Dennis was lying on the couch. Jessica had a conversation with defendant. Defendant told her that he could not believe that he had hit his "son." He said that he lost his temper. Jessica told defendant that Dennis needed some sleep, and defendant replied, "No, I want him to stay awake so I know he's okay." Apparently, Jessica and defendant let Dennis sleep, and they then went to sleep.

Jessica woke up about 1:45 p.m. At that time she had a conversation with Dennis. He told her that his "dad" had got upset the night before. Dennis also complained of a slight stomachache. At that time Jessica saw bruises on the boy's face, arms, and chest.

Jessica testified she went to the grocery store, leaving Dennis lying on the couch. When she returned, she and defendant had a conversation. Defendant was very upset, and he said that he had hit Dennis too hard. It was during this conversation that defendant dis-

covered the child was not breathing, and the ambulance was called.

The State also introduced various photographs and items of physical evidence from defendant's car and the apartment. There was dried blood on the dashboard, windshield, passenger door, and back seat of defendant's car. From the apartment police recovered a pillow, a towel, and a nylon sock with part of a wire hanger inside of it. All of these items had dried blood on them. Also recovered from the apartment were two belts and a bar of soap with teeth marks on it.

The State introduced evidence of prior incidents involving the discipline of the child. Rhonda Pomeroy, who lived across the hall from the apartment, testified that defendant, Jessica, and Dennis moved in about the beginning of October 1983. She testified that on the weekend of October 8 and 9 she noticed that Dennis had bruises on the side of his face, and his lips were swollen. Pomeroy testified that she and her husband asked defendant what had happened. He replied that Dennis had been too loud, and that he (defendant) had stuck a sock in his mouth. Defendant told the Pomeroys that Dennis pulled the sock out and bit him on the knuckle. Defendant told the Pomeroys he struck the child "out of reflex." Later that month Pomeroy observed makeup on the bruises. Defendant told her he put the makeup on the bruises because he was embarrassed. Pomeroy also described an incident in which she observed defendant spank the child with a belt. Finally, Pomeroy testified that during the middle of October she observed that there was a patch of hair missing on Dennis' head near the crown. Defendant told Pomeroy that he had been holding onto Dennis by the hair, and that "Dennis wouldn't give," and that the hair was pulled out in that way.

Pomeroy testified that during October 1983 she saw bruises on Dennis five, six, or seven times. She said that on these occasions Dennis would tell her that his dad hit him.

Pomeroy also testified about a conversation she had with defendant in which he told her that he did not know how to handle Dennis anymore. Defendant told her that he could beat Dennis, and the boy would turn around and laugh at him. Pomeroy and her husband told defendant that "he was going to hurt him [Dennis] bad if he didn't, you know, spanking him or doing the things he would, could really hurt him."

Cora Reed testified that she lived in the same apartment building as defendant, and that she babysat Dennis on numerous occasions. Reed said that on October 15, 1983, Jessica came to her apartment. She was very upset. She showed Reed a note defendant had written which said, "Jessica, I've taken Dennis to the police to turn him over

as an abandoned child. Call the Chicago Police in about an hour. I love you, Don." Reed also testified that two days later she observed bruises on Dennis' face. She also observed that there was some hair missing from his scalp. Jessica informed Reed that "[w]e've had a rather rough weekend."

Finally, Jessica testified that defendant and she forced the child to bite down on a bar of soap when he said something "ugly." She testified that she did not strike the child on October 30, but she had previously struck the child hard enough to leave marks. She said that prior to the weekend of October 29 and 30, 1983, she and defendant had discussed the problems they were having with Dennis. Jessica told defendant that she thought sometimes he was a little too strict. They discussed obtaining family counseling. Jessica said that Dennis had frequent temper tantrums, and that she and defendant wanted to learn how to cope with these tantrums without having to punish Dennis.

For the defense, Karen Jones, defendant's mother, testified. She described a temper tantrum Dennis had had when he was at her house in April 1982, when he was told that it was time to take a bath and go to bed. During the tantrum the child kicked, flailed about, and threw himself around the room. As a result of the tantrum, Dennis received bruises to his knees and his arm.

Defendant testified in his own behalf. He was in the United States Navy and was stationed at the Great Lakes naval base in North Chicago. He was taking a difficult course of study in the Navy, and every fourth day he was required to be on the base for 24 hours. He had had very little sleep prior to the date in question. When Jessica went to work on October 29, 1983, she dressed up like a cat. She and defendant made ears for the costume by placing hangers inside of socks.

Defendant described his night at the Weekley's home. His testimony about the trip from there to the Blue Suede Shoes was substantially similar to his statement to Officer Phelps. In addition, he testified that there were two stick shifts in the car, and Dennis could have struck them while he was flailing about. At one point the child threw himself across defendant. This conduct almost caused an accident. Defendant testified that when he struck Dennis, he did so with the back of his hand, and the blows were not delivered with full force. The entire incident lasted 10 to 15 minutes. Defendant said he did not want to hurt Dennis, but he was aware of "the possibility of hurting him while driving the car and trying to strike him." He did not think that he was hurting Dennis. He was not aware of striking the boy in

the stomach or lower.

Defendant testified that when he and Dennis arrived at Blue Suede Shoes, Jessica told him she had to work another hour. Defendant drove home and took Dennis upstairs and into the bathroom. Dennis undressed himself and took a bath. Defendant observed a reddening on the boy's arms and face at that time, but defendant did not believe that the boy was seriously hurt.

Defendant testified that he went back to Blue Suede Shoes and picked up Jessica. When they arrived home, defendant went to sleep. Defendant described how, after he woke up, he discovered that the boy was not breathing, and he attempted to revive the boy with CPR until the paramedics arrived.

It was based on the evidence recounted above that the trial court found defendant guilty of murder. Judgment was entered on the finding and the matter was continued for sentencing. A presentence report was prepared which indicated that defendant had one prior conviction. The offense was "Buying/Selling/Possessing a Vehicle with Altered Number," and it occurred in California. The sentencing hearing in this case was rather lengthy. The principal factual question presented was whether defendant had tried to hire someone to kill Jessica Carson prior to the trial. The State introduced a note which defendant had written and given to Timothy Strich, a fellow inmate in the Lake County Jail. At the top of the note was Jessica's name, and home and work addresses. Below the addresses was a description of the car she was driving, including the license plate. Below that, the following language appeared:

> "Note: Should except [sic] blame for childs death admit to beating him whail [sic] boy friend was asleep & state that boy friend lied to protect her from jail that she apologizes [sic] for all shes done to everybody."

Strich testified that when he was in jail awaiting trial on a charge of aggravated battery, defendant approached him and asked him if he knew anyone who could be hired to kill Jessica Carson. Strich replied that he was not sure. Defendant said that he wanted Carson's death to look like a suicide, and he gave Strich the note described above. Defendant was supposed to give Strich $50 and then $450 more when Strich was released.

Strich testified that on February 10, 1984, he contacted Daniel Colin, a deputy sheriff, and told him of the plot. On February 14, 1984, Strich was released on a recognizance bond. Strich sent defendant a note asking for the $450, but defendant refused to release it.

According to Strich, a few days later he received a telephone call

from defendant, who asked him to come to the jail. Strich did so, and when he met defendant, the latter accused him of "talking to the cops" about the plan. Defendant told Strich that the deal was off. According to Strich, he then asked defendant for $250 defendant owed him from gambling in the jail. Defendant paid him the $250.

Strich also testified that he had a conversation with defendant about the charges against him. In the course of that discussion, defendant related that he was going to pick up his girlfriend from work. She had to work overtime. When defendant started driving back home, Dennis started screaming. Defendant turned around and slapped the boy. When the boy continued to scream, defendant grabbed a fork, "jabbed it" toward the back seat, and "caught the child" in the penis. Strich denied reading any police reports about the incident.

Finally, Strich testified that he had pleaded guilty to the aggravated battery charge and was awaiting sentencing. The prosecutor had agreed to appear at his sentencing hearing, and to testify on his behalf regarding his involvement in defendant's sentencing hearing. In addition to the conviction of aggravated battery, Strich had a prior robbery conviction.

The State also called Henry Reed, an assistant jail superintendent. Reed testified that after Strich had been released from the jail, defendant requested to speak with Reed. He told Reed that he had previously made a statement in anger to Strich that he wanted to get rid of his girlfriend. Defendant told Reed he had not meant it, but that Strich was requesting that he release a certain amount of money to him "to pay him off." Defendant told Reed that he was not going to give Strich the money.

The State also introduced into evidence photographs of the child's wounded penis.

Defendant testified that at one point when he was in the jail, he told Strich he wished Jessica would just go away. He was angry at her because of some statements she made to the police. According to defendant, Strich offered to have Jessica killed for $450. Defendant said he did not want that done. Strich continued "bugging" defendant about having Jessica hurt, so defendant finally wrote the note with the information about Jessica and gave it to Strich "[t]o get him off my back." Defendant testified that Strich told him to write the portion of the note about Jessica accepting blame for the child's death. Defendant did not think that Strich was serious.

Defendant testified that when he contacted Reed, he was beginning to take Strich seriously. Defendant said he asked Reed to stop

Strich from hurting Jessica, and Reed replied that he could handle it.

Defendant testified that when Strich came to visit him in the jail, he threatened to hurt Jessica unless defendant paid him $250. Defendant did not owe Strich a gambling debt. Defendant gave Strich the money to protect Jessica. Defendant subsequently telephoned Jessica and told her to watch out for Strich.

Defendant denied telling Strich that he had jabbed Dennis' penis with a fork. Defendant testified that there was a police report which stated that Jessica had informed police that there was a knife and a fork in the car, and had suggested that they might have been used to put the wounds on Dennis' penis. Strich read this report in defendant's presence.

Defendant called John Emrich, a jail officer. Emrich testified that during the early part of February, he overheard part of a conversation between defendant and Strich. Strich said to defendant, "If you don't give me the money I'm going to go ahead with the contract." Defendant appeared nervous and upset and later handed Emrich a note releasing $250 to Strich.

Defendant called Gay Olson, a friend of Jessica's, who confirmed that on February 18, 1984, defendant telephoned Jessica to warn her about Strich.

Defendant also called two other inmates of the jail, George Paul Goodman, and Larry Robert Larson. They gave testimony corroborating defendant's account of his interactions with Strich.

Following the presentation of this evidence, the court sentenced defendant to natural life imprisonment.

■ We first consider defendant's argument that the conviction of murder should be reduced to involuntary manslaughter. The offense of murder is defined, in relevant part, as follows:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> * * *
>
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual * * *." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2).)

Involuntary manslaughter is defined as follows:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly * * *." (Ill. Rev. Stat.

1983, ch. 38, par. 9—3.)

A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1983, ch. 38, par. 4—6.

Defendant contends that the evidence does not show that he knew that his conduct in beating Dennis created a strong probability of death or great bodily harm (the mental state required for murder), but rather it shows that he was attempting to restrain the child who was throwing a tantrum, and that he did so recklessly (mental state required for involuntary manslaughter). We disagree.

In *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455, the defendant was convicted of murdering a 14-month-old boy. The child and his mother were residing with the defendant. The evidence disclosed that the defendant struck the child in the stomach and jerked him off of the floor. The child died of peritonitis caused by an explosive rupture of the stomach from blunt trauma. Other evidence indicated that defendant had previously abused the boy. On appeal the defendant argued that he was guilty of only involuntary manslaughter. This court disagreed, stating that it was not necessary to directly prove that the defendant intended to kill, only that he voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life. The court stated that the requisite mental state could be inferred from the character of the act. The court concluded that, based on defendant's conduct in striking the baby, and the evidence of previous abuse, the jury properly inferred that he had the requisite mental state for murder. See also *People v. Mifflin* (1984), 120 Ill. App. 3d 1072, 458 N.E.2d 1343 (murder conviction upheld where defendant struck his 14-month-old son, who had been previously abused, on the head and threw him across the room at the crib, and the cause of death was cerebral death due to edema resulting from trauma); *People v. Szerletcih* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098 (murder conviction upheld where defendant hit a one-year-old child in the head three or four times, and death resulted from blunt trauma to the head which resulted in a fractured skull).

In the instant case the evidence shows that defendant administered a very severe beating to the four-year-old victim which lasted 10 or 15 minutes. The beating resulted in numerous bruises, abrasions, and lacerations in addition to numerous internal injuries as recounted by Dr. Blum. The natural tendency of this conduct was to destroy the

boy's life or do great bodily harm. In fact, defendant admitted at trial that he was aware of "the possibility of hurting him while driving the car and trying to strike him." In addition, there was evidence that defendant had previously abused Dennis and had been warned that if he did not stop, he was going to hurt the boy badly. Finally, shortly after the beating defendant told Jessica that he wanted the boy to stay awake to make sure he was all right. Jessica testified that later that day, defendant was very upset, and he said that he had hit Dennis too hard. Under these circumstances, the trial court was amply justified in concluding that defendant knew his acts created a strong probability of death or great bodily harm to Dennis.

Defendant suggests that the trial judge made such a finding because of his expressed "belief that manslaughter did not apply to cases involving an adult and a child." The judge, however, at no time expressed such a belief. Defendant's suggestion is apparently based on the following colloquy which occurred during the closing argument of defense counsel:

> "[DEFENSE COUNSEL:] *** I think that most of the cases where there is a conviction for murder under knowledge involves some instrumentality, some weapon, something outside of mere physical attack.
>
> THE COURT: Those are generally adult on adult aren't they?"

In this colloquy the trial judge was merely making reference to the principle that although under given circumstances, a fatal blow from a bare fist may not be considered murder, where disparity in size and strength are sufficiently great, a murder conviction can be warranted. *People v. Drumheller* (1973), 115 Ill. App. 3d 418, 304 N.E.2d 455.

■ We next consider defendant's contention that the trial court improperly admitted hearsay and irrelevant evidence. Defendant first contends that Rhonda Pomeroy should not have been allowed to testify about seeing bruises on Dennis unless it was established that he inflicted the bruises. Defendant acknowledges that prior instances of abuse were relevant to the question of his mental state (see *People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148), but he maintains that such relevance was dependent on proof that he was responsible for the prior abuse. Initially, we note that the State did establish that defendant was responsible for some of the previous abuse. Pomeroy testified that defendant admitted striking the child in the face, and pulling a shock of his hair out. She was permitted to testify that she saw bruises on Dennis five, six, or seven times in October 1983, and the State did not establish that defendant was responsible each time.

Defendant, however, did not object to this testimony on the basis he now asserts at trial or in his post-trial motion. Under these circumstances, the issue has been waived. (*People v. Tate* (1984), 122 Ill. App. 3d 660, 462 N.E.2d 662.) Defendant requests that we review this contention as plain error under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), but we do not believe such consideration would be appropriate. This was a bench trial, and a trial judge is presumed to have considered only competent evidence. *People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834.

■ Defendant next complains about Pomeroy's testimony that on each of the occasions she saw bruises on Dennis, he told her that his dad hit him. Defendant contends that this evidence was hearsay. Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of the matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) In the instant case the trial judge stated that he was not admitting the evidence for the truth of the matter asserted, but rather as a foundation for Pomeroy's conversations with defendant. At one point the judge stated that the evidence was being admitted as it related to "the reasonableness of the belief of the communication." Defendant argues that the latter basis for admitting the evidence is essentially equivalent to admitting it for the truth of the matter asserted. He maintains that any distinction would be "hair-splitting semantics." We disagree. Although the trial judge could have stated his rationale for admitting the evidence more clearly, we believe that it was admitted to show why Pomeroy confronted defendant and warned him to stop beating the boy. For this purpose it was not hearsay.

■ Defendant next complains about Cora Reed's testimony concerning the note written by defendant that Jessica showed her on October 15, 1983. In the note defendant stated that he had taken the boy to the Chicago police to turn him over as an abandoned child. Defendant maintains that this testimony was irrelevant. When defendant objected at trial that the evidence was irrelevant, the trial judge admitted it, stating that he could see "a potential for relevance." Defendant did not subsequently move to strike the evidence, and the issue was not raised in his post-trial motion. In our judgment, the admission of this evidence does not require reversal. The trial judge stated only that the evidence had a "potential" for relevance. If, as defendant contends, this potential was not realized and the evidence was not sufficiently connected to the offense, it would be pre-

sumed that the trial judge gave it no weight. See *People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834.

■ Finally, defendant contends that the trial court improperly admitted the bar of soap with teeth marks, a belt recovered from the apartment, and the sock with a portion of a clothes hanger in it which had served as part of Jessica's cat costume. Defendant argues that these items were irrelevant. We need not give a lengthy consideration to the relevance of each of these particular items because, in our judgment, they could not have been a material factor in defendant's conviction. If it was error to admit these exhibits, the error was harmless beyond a reasonable doubt. Defendant suggests that the admission of the sock with the wire in it "falsely implied some type of bizarre torture." This case was tried by the court, and there is no indication that the trial judge engaged in such a flight of fancy. We will not presume that he made such an outrageous inference. See *People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834.

■ We finally consider defendant's arguments attacking his sentence of natural life imprisonment. That sentence was imposed under section 5—8—1(a)(1)(b) of the Unified Code of Corrections, which gives the trial court discretion to impose such a sentence for murder "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1).) In our judgment, the trial court's finding in this regard is amply supported by the evidence. Our supreme court has stated that the language quoted above is not limited to murders in which the defendant inflicted torture or unnecessary pain upon the victim. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344.) The term "brutal" has been defined as "grossly ruthless," "devoid of mercy or compassion; cruel and cold-blooded." (88 Ill. 2d 482, 501, 431 N.E.2d 344.) "Heinous" has been defined as "hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal." (88 Ill. 2d 482, 501, 431 N.E.2d 344.) These terms aptly describe defendant's conduct in beating the four-year-old victim to death.

■ Defendant contends that the trial court improperly considered two statutory factors in aggravation. The first factor was that "the defendant's conduct caused or threatened serious harm." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(1).) Defendant argues that because all murders cause serious harm, this factor should not be considered in aggravation in a murder case. This contention was rejected in *People v. Hughes* (1982), 109 Ill. App. 3d 352, 440 N.E.2d 432. We agree with that decision and conclude that the trial judge properly

considered this factor.

■ The second statutory factor in aggravation which defendant contends was improperly considered is that "the defendant, by the duties of his office or by his position, was obliged to prevent the particular offense committed ***." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(a)(4).) Defendant's claim that the trial judge found this factor to be present is not supported by the record. The trial judge stated that that factor "really doesn't apply to this factual situation in its exact language." The trial judge went on to state that the fact that defendant was a father-figure to the boy placed special responsibilities on defendant to protect the child. The trial judge found that defendant abrogated those responsibilities by beating the child, and by failing to seek medical attention for the boy for nine hours after the beating even though defendant knew the child was seriously injured. The trial judge stated that these considerations, which are similar to the statutory factor quoted above, aggravated the offense, and we agree with that determination. Defendant argues that there was no evidence to support the trial judge's conclusion that defendant knew, prior to the time that the paramedics were called, that he had seriously injured the boy. Defendant has overlooked Jessica Carson's testimony that when she returned home on the morning of the beating, defendant told her that he wanted the boy "to stay awake so I know he's okay." Later that afternoon, and prior to the discovery that the boy was not breathing, defendant was very upset and told Jessica that he had hit Dennis too hard. This testimony, as well as the evidence regarding the nature of the injuries, supports the conclusion of the trial judge that defendant knew that the boy was seriously injured and failed to seek medical attention for him.

■ Defendant also argues that the trial court failed to consider in mitigation the stress that he was under as a result of his rigorous duties in the Navy, and the child's tantrum. We do not believe the record supports this argument. The basis for defendant's conclusion that this stress was not considered is that the trial court refused to find the statutory factors in mitigation that "the defendant acted under a strong provocation," and that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—5—3.1(a)(3), 9—1(c)2.) Defendant, however, concedes that "[t]he court was correct, in a very strict sense, since no psychiatric evidence was introduced as to an organic or mental illness of [defendant] and it would not only be preposterous but callous to argue that the conduct of a child 'provoked' a severe and fatal beating." The trial judge stated that he had

considered the evidence received at the trial and the sentencing hearing, as well as the presentence report. Under these circumstances, we will presume he considered the stress defendant was under even though it was not sufficiently severe to qualify under the language quoted above. See *People v. Talach* (1983), 114 Ill. App. 3d 813, 448 N.E.2d 638.

Defendant's final argument related to sentencing is that the trial court should not have believed Strich's testimony that defendant had told him that he (defendant) had "jabbed" a fork toward the back seat and "caught the child" in the penis. The record reflects that the judge did believe this testimony. Defendant argues that this finding was contrary to the pathologist's testimony at trial that in his opinion the injuries to the penis, including the laceration, were caused by blunt trauma. We cannot conclude that there is a fatal inconsistency in this regard. Dr. Blum stated that "blunt trauma is simply trauma caused by flat or hard objects, as opposed to gunshot wounds or sharp instruments, such as knives." Clearly, if the fork had penetrated the child's pants, and punctured his skin, the blow would not have been blunt trauma. If, however, the fork did not penetrate the pants, the blow might have qualified as blunt trauma. Dr. Blum was not questioned on this point. At the sentencing hearing photographs were admitted that showed three closely spaced cuts on the underside of the child's penis. These photographs corroborated Strich's testimony and provided a sufficient basis for the trial judge's finding.

The determination of an appropriate sentence in any given case can be a difficult task. The trial court is normally the proper forum in which a suitable sentence is to be determined, and the trial judge's decisions in this regard are entitled to great deference and weight. It should be modified only where the trial judge has abused his discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344.) We cannot find such an abuse in the instant case.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.