THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PETER PIRRELLO, Defendant-Appellant.

Second District    No. 2—86—0724

Opinion filed February 19, 1988.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Peter Pirrello, was charged by information with murder. Defendant admitted killing the victim, Mark Thomas, but testified at trial that he had done so in self-defense. Defendant was, nevertheless, found guilty by a jury, and was sentenced to a 40-year term of imprisonment. Defendant now appeals, arguing that he was denied a fair trial in several respects. We reverse and remand for a new trial.

Mark Thomas' body was found about 7:30 p.m. on July 26, 1985, at the Kapota Gun Club near Shirland, Illinois, by a member of the club. He had been shot three times with a shotgun, the cause of death being a shotgun wound to the back of the head. Several shotgun shells, both fired and unspent, were found near the body.

The State presented the testimony of Melissa Bouma, age 25, who had known Thomas for 10 years and had lived with him the last four years. She testified that she last saw Thomas at Calhoun's, a bar in Rockford, on July 23, 1985. When Bouma arrived at the bar at 11 a.m., she recognized Danny Allen. She told Allen that Thomas would be coming to the bar, and shortly thereafter Allen made a phone call. Ten minutes later, the defendant, whom Bouma knew as "Algie," came to Calhoun's and sat with Allen at a table near the front door. Thomas arrived a few minutes later and went to where Bouma sat at the bar. Allen called Thomas over to the table. A few minutes later, Bouma walked over to the table, where she heard Allen ask if Thomas could get cocaine for defendant. Bouma testified that Thomas said he could take defendant to a friend and that his friend would have to go get the cocaine. Bouma returned to the bar, from where she heard defendant say that Thomas would need sunglasses to ride on defendant's motorcycle. Allen obtained a pair for Thomas. Thomas told Bouma he would be back in an hour and left the bar with defendant. Bouma never saw Thomas again.

The State also called Danny Allen as a witness. He testified that he knew both Thomas and defendant. When he testified that he knew Thomas because of their past dealings in cocaine, the trial court asked if the State had informed Allen that he did not have to answer questions which might incriminate himself. The State responded that it did not intend to prosecute Allen with respect to his testimony and asked that Allen be granted immunity with respect to any cocaine dealings on July 23, 1985. The trial court appointed attorney Gordon Ring to consult with Allen. When Ring asked what the extent of the immunity would be, the State refused to extend immunity beyond any drug transactions on July 23, 1985, and then withdrew its request for immunity entirely. Ring then informed the court that his advice to Allen "would be to invoke his right to the fifth amendment on anything it involves." When direct examination was resumed, Ring advised Allen to invoke his fifth amendment rights after each question, and Allen did so. Defendant moved for a mistrial based on the questioning of Allen, but the motion was denied.

The State also presented the testimony of three witnesses, Steve, Kathy and Vicky Peppers, with whom defendant had talked shortly after the shooting. Each testified that defendant told them he had shot someone who was involved in the killing of defendant's ex-wife.

Jay Long was the first witness for the defense. He testified that on the morning of July 23, 1985, defendant called home. Karen Christen, defendant's landlord's daughter, answered the call and gave the phone to Long. Defendant asked Long to get defendant's gun out of his closet and bring it and his leather jacket to the bar from where defendant was calling. Defendant explained that he was going to sell the gun and would then pay Long $75 that defendant owed him. Long took the gun, which was in a gun sock, along with the jacket, and Christen drove him to a bar on Seventh Street. Long gave defendant the jacket and gun in the parking lot and left.

Defendant also testified in his own behalf. He testified that his ex-wife, Leslie, had been murdered on July 15, 1985, and that he had taken her death very hard. After that, defendant drank heavily, as was also testified to by the Peppers.

On the morning of July 23, 1985, defendant was drinking at the Railroad Tap in Rockford, where he met and talked with Danny Allen. The trial court did not allow defendant to testify as to their conversation. Defendant left the Railroad Tap and went to Calhoun's where he had another drink and met and talked with Allen once more. Some time later, a man, whom defendant did not recognize, came into Calhoun's and talked with Allen and a woman, whom defendant later

learned was Melissa Bouma, at the bar. Allen brought the man to defendant's table and introduced him as Mark Thomas. Again, defendant was not allowed to testify to the content of his conversation with Allen and Thomas, although in an offer of proof, defense counsel stated that at the Railroad Tap Allen told defendant that Thomas wanted to buy a shotgun. Defendant said he had a shotgun and would sell it to Thomas. At Calhoun's, the offer of proof continued, the conversation was about the sale of the gun, and drugs were not mentioned.

Defendant went on to testify that while at Calhoun's, he called home and asked Long to bring him his shotgun so he could sell it. The gun was a Winchester Model 97 .12-gauge pump-action shotgun. Long brought him the gun and his jacket, which defendant tied to the front of his motorcycle. He and Thomas then left the bar to test-fire the gun at the Kapota Gun Club, where defendant had been on previous occasions.

When they arrived at the club, defendant gave the shotgun and some shells from the case to Thomas. As they walked toward the firing range, Thomas loaded the gun. Thomas then pointed the gun at defendant's forehead and ordered defendant to his knees, saying that he was going to kill defendant. Defendant testified that Thomas yelled, "I know who you are. You are going to die like Leslie did. I'm going to blow your fucking head off. You better be praying." Thomas then pushed defendant, who was on his knees, with the shotgun and pulled the trigger, but the gun did not fire. As Thomas tried to work the pump action, defendant grabbed the barrel of the gun and they began to fight. The wooden stock of the gun came off in Thomas' hands, and defendant grabbed the rest of the gun as he fell back. Defendant turned the gun around, pushed the slide up, and the gun fired. Thomas hit defendant on the head with the stock. Defendant shot again, got up, and backed away, firing in a panic as he moved. He testified that all of the shooting occurred in a matter of seconds. Defendant then threw the gun down, got on his motorcycle, and rode back to Rockford.

Back in Rockford, defendant went to Good Time Charlies. He tried to call a friend for help, but got no answer. He then sat at the bar for about an hour drinking whiskey and trying to talk to Kathy and Vicky Peppers. He then went home, dropped off the motorcycle, and was driven back to the gun club by Long. Defendant found the gun and threw it into a river a mile or two from the club.

On cross-examination, defendant testified that Bouma was never close enough to hear the conversation at the table in Calhoun's. He

also testified that he had owned the shotgun for four years but had only fired it on one occasion because it had no safety and was very unsafe. He said the gun had a short barrel and that the stock had been cut short by a previous owner.

It was stipulated that Thomas had been convicted of battery in May 1984.

In rebuttal, a State's witness testified that the stock from defendant's shotgun was found by the police on defendant's bedroom dresser on July 27, 1985. The State also called Deputy Coroner David Swanson, who testified about and demonstrated a Winchester Model 97 shotgun that he owned. He testified that the Model 97 would not fire if the exposed hammer was only pulled halfway back, but that it could also be fired by putting pressure on the trigger and pumping the slide forward. He also stated that there were several different versions of the Model 97.

After closing arguments and instructions, the jury deliberated for five hours before returning a guilty verdict.

■ Defendant's first argument is that the trial court erred in allowing Bouma to testify to the conversation in Calhoun's, while later denying defendant the opportunity to testify to the same conversation. As noted above, Bouma testified that she overheard a conversation between Thomas and Allen at defendant's table. Over defendant's objection, she testified that Allen "[a]sked if Mark could get [defendant] some cocaine." She then testified to Thomas' response: "He said he could take him to a friend of his house [sic] and that his friend would have to go get it." Defendant contends that Bouma's testimony was hearsay, while the State responds that the testimony was offered for a nonhearsay purpose.

Hearsay is classically defined as evidence of an out-of-court statement offered to show the truth of the matter therein. (*People v. Jones* (1986), 140 Ill. App. 3d 660, 673.) The State argues that Bouma's testimony was elicited to show that defendant and Thomas left the bar together and, more importantly, to show why Thomas left with defendant. The State now posits that the shooting was not actually drug related, but rather that defendant used the pretext of a drug deal to lure Thomas from the bar. The State concludes that the statements were only introduced to explain Thomas' conduct, not whether defendant wanted cocaine from Thomas, and as such did not constitute hearsay.

It is true that an out-of-court statement introduced for the purpose of explaining an actor's conduct, and not for the purpose of establishing the truth or falsity of the statement, does not constitute

hearsay. (*People v. Lewis* (1986), 147 Ill. App. 3d 249, 258.) Thus, if the State had only utilized the out-of-court statements for the reasons argued on appeal, no hearsay problem would be presented. But, as defendant notes, the State specifically argued to the jury that the shooting was drug related, characterizing Bouma's testimony as "hard evidence they were involved in some kind of dope deal." The State also pointed to evidence that papers and cards from Thomas' pocket were strewn about the body and argued that defendant had searched the body for the money involved in the deal. The State's argument thereby obviated the nonhearsay use of Bouma's testimony and created a strong possibility that the jury would view the statements as proving the truth of the matters therein. (See, *e.g.*, *People v. Escobar* (1979), 77 Ill. App. 3d 169, 177.) In this vein, it should also be noted that the jury was never instructed as to the "limited" purpose for which Bouma's testimony was being admitted.

The State continues, though, that even if Bouma's testimony was hearsay, its introduction was harmless. The State characterizes Bouma as a minor witness who had no knowledge of the ultimate issue, *i.e.*, whether defendant acted in self-defense. This argument flies in the face of the State's theory below. The State argued that defendant preconceived the killing and lured Thomas to the gun club with the drug transaction. If the jury believed that defendant planned in advance to kill Thomas, then defendant's self-defense claim would be completely negated. The hearsay use of Bouma's testimony was thus clearly not harmless.

Defendant goes on to argue that the error in allowing Bouma to testify to the conversation was compounded by the trial court's later ruling which, on hearsay grounds, prohibited defendant himself from offering his account of what was said. Defendant offered to testify that he, Thomas, and Allen discussed the sale of defendant's shotgun and that he and Thomas agreed to go to the gun club to test-fire the weapon. Drugs were not discussed.

This testimony should have been allowed for either or both of two reasons. First, defendant argued that his version of the conversation was not hearsay, just as the State argued in Bouma's behalf. Defendant offered the testimony to show what his state of mind was when he left the bar. This testimony was proper to explain defendant's and Thomas' conduct, just as Bouma's testimony would have been proper to explain their conduct had the State used her testimony for that reason. *Lewis*, 147 Ill. App. 3d at 258.

Second, even if defendant's testimony was hearsay, "where a portion of a conversation is related by a witness the opposing party has a

right to bring out all of the conversation." (*People v. Harman* (1984), 125 Ill. App. 3d 338, 342.) While this principle is usually applied so that when a single witness has testified to a part of a conversation, the opposing party is allowed to question the *same* witness as to the rest of the conversation, this court in *Harman* did not specify such a limitation. (*Harman*, 125 Ill. App. 3d at 342.) Although the State again argues that refusal of defendant's testimony was harmless, the reason why he left the bar with Thomas is certainly relevant, if not crucial, to defendant's claim of self-defense. It thus appears that defendant should have been allowed to testify to his version of the conversation, especially after the State had already presented its own version of the same event, and, as will be discussed next, the other parties to the conversation were unavailable.

■ Defendant next argues that he was severely prejudiced when the prosecutor called Danny Allen as a witness, despite knowledge that Allen would invoke his privilege against self-incrimination, and then proceeded to ask Allen a series of leading and suggestive questions. After Allen's attorney informed the court that he would advise Allen to invoke his fifth amendment right, the State nevertheless asked Allen about his relationship with defendant, whether he and defendant discussed a drug deal, whether he discussed a drug deal with Thomas and the defendant, and whether he or defendant gave money to Thomas. Defendant strenuously objected to the entire line of questioning, but the trial court denied the objections, denied a motion for mistrial based on Allen's questioning, and refused to grant Allen immunity so that he could answer the questions. (The questions asked of Allen are fully set forth in Appendix A to this opinion.) Defendant contends that, based on *People v. Crawford Distributing Co.* (1979), 78 Ill. 2d 70, the questioning of Allen constituted reversible error.

In *Crawford*, our supreme court acknowledged that on several occasions it had held "that it is reversible error for the prosecutor to compel a witness to claim his constitutional privilege before the jury when the effect is to suggest by implication or innuendo that the defendant is guilty of a crime. (78 Ill. 2d at 74.) The *Crawford* court went on to state, however, that "[e]ach case must be decided in light of its own facts and circumstances." (78 Ill. 2d at 74-75.) Relevant considerations include the prosecutor's motive in calling the witness and the likelihood of the jury drawing unwarranted inferences against the defendant from the witness' refusal to testify. 78 Ill. 2d at 75.

In deciding whether error had occurred, the *Crawford* court looked to *Namet v. United States* (1963), 373 U.S. 179, 10 L. Ed. 2d

278, 83 S. Ct. 1151, which noted two situations which constitute reversible error. One is where a prosecutor "makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," and the second is where " 'a witness' refusal to answer adds critical weight to the prosecution's case in a form not subject to cross-examination.' " (*Crawford*, 78 Ill. 2d at 75, quoting *Namet*, 373 U.S. at 186-87, 10 L. Ed. 2d at 283-84, 83 S. Ct. at 1154-55.) After examining the facts before it, the *Crawford* court determined that neither of those situations was present.

The facts presented in the case at bar, however, are very different from those in *Crawford*. In *Crawford*, the prosecutor had sought and obtained a grant of immunity from prosecution for the witness, and thus had every right to expect and, in fact, to demand the witness' testimony. (78 Ill. 2d at 75.) Here, the State actually *withdrew* its earlier offer of limited immunity for Alien. Thereafter, Allen's attorney informed the court and the parties that Allen would not answer questions about his involvement with defendant or Thomas. Despite the knowledge that Allen would refuse to answer, the State was allowed to propound leading question after leading question to Allen, effectively setting forth its own version of what happened among Allen, Thomas, and defendant. A further difference between this case and *Crawford* is that in *Crawford*, the witness invoked his fifth amendment privilege only once, and even then recanted, returned to the witness stand and testified. (78 Ill. 2d at 75.) Here, Allen invoked his privilege in response to every question and did not later equivocate.

On appeal, the State agrees that "the better practice is to refrain from this type of examination," but contends that any error in the instant procedure was harmless, since the testimony had no bearing on whether defendant shot Thomas in self-defense. Once again, this argument ignores the thrust of the State's case below. The State argued that defendant planned the drug deal to get Thomas to the gun club. The premeditation implied in that theory is irreconcilable with defendant's claim of self-defense. Allen's "testimony" was thus just as important as Bouma's to support the State's theory, since the State's questions insinuated that Allen and defendant conspired in advance to set up the deal. A logical inference from Allen's refusal to answer questions about the drug deal is that both he and defendant were involved in the ruse. Any possibility of a benign intent behind the State's questioning is negated by the fact that the prosecutor twice referred to Allen as "defendant" in the presence of the jury and by reference to Allen's invocation of his constitutional privilege during closing argument, which "could only operate to prejudice the defend-

ant." *People v. Haran* (1963), 27 Ill. 2d 229, 237.

In summary, "[w]hile the examination added little material evidence to the trial, it was certainly well calculated to prejudice the defendant in the eyes of the jury." (*People v. Bennett* (1953), 413 Ill. 601, 605; see also *People v. Myers* (1966), 35 Ill. 2d 311, 334.) Under the standard enunciated in *Crawford*, reversible error occurred when the trial court permitted the pointless, yet prejudicial examination of Allen.

■ Defendant's third argument is that the trial court erred in permitting Deputy Coroner Swanson to testify in rebuttal and offer a demonstration regarding the operation of Swanson's own Winchester Model 97 shotgun, in allowing the prosecution to argue to the jury based on the demonstration, and in letting the gun go to the jury during deliberation, since Swanson's weapon was obviously not the one used to kill Thomas, and it was impossible to determine if the two guns were in substantially similar condition.

Defendant concedes that a trial court has discretion to permit demonstrations and that, to constitute reversible error, there must be a showing that the court has abused that discretion to the prejudice of the defendant. (*People v. Rose* (1979), 77 Ill. App. 3d 330, 334.) In deciding whether the trial court properly exercised its discretion, reviewing courts look primarily to whether the demonstration is probative of facts in issue and whether it is conducted under substantially similar conditions and circumstances as those which surrounded the original occurrence. (*People v. Carbona* (1975), 27 Ill. App. 3d 988, 1003-04.) Defendant contends that the demonstration here was neither probative of a fact at issue nor was it conducted under circumstances similar to the actual shooting.

Defendant first questions whether the operating condition of his shotgun was really at issue since he raised the defense of self-defense, not accident. It seems, however, that the manner in which a Model 97 fires was an important part of defendant's version of the shooting. He testified that the gun would not fire when Thomas first tried to shoot him, and, in fact, the demonstration which showed that the gun could not be fired if the hammer was halfway back actually supports defendant's testimony. When someone testifies that a weapon operates in a certain way during a shooting, the manner of the weapon's operation is not irrelevant to the jury's determination of whether the shooting occurred as described.

Defendant next argues that due to the differences between his gun and Swanson's, the demonstration was not conducted under substantially similar conditions and circumstances as those which sur-

rounded the incident in question. Defendant points out that his gun, according to his own testimony, had a particularly short barrel and that the wooden stock had been shortened by a previous owner. He also testified that the gun was not in good condition but had even misfired once in the past. Swanson's gun, on the other hand, had a normal barrel length and stock and was apparently in good working order. Furthermore, defendant notes, Swanson testified that there are different versions of the Model 97. Despite the differences defendant points to, it does not appear that the guns were so substantially different in any relevant characteristic so that the demonstration was error *per se*. The lengths of the barrel and stock were not as important as the manner in which shells could be fed into the chamber and the ways in which the gun could be fired. As for the different versions of the Model 97, the main difference between them to which Swanson testified is the barrel lengths. These minor differences simply go to the weight the jury would give to the demonstration, not the admissibility of the demonstration itself. See, *e.g.*, *People v. Pfanschmidt* (1914), 262 Ill. 411, 465-66; *Carbona*, 27 Ill. App. 3d at 1004.

Defendant goes on to argue, however, that it is always error to admit evidence of weapons not proved to be connected to the offense in question, citing *People v. Yelliott* (1987), 156 Ill. App. 3d 601. In *Yelliott*, the prosecution introduced a gun which had not been proved to have ever been in the defendant's possession, yet argued that defendant had used the gun to commit armed robbery. (156 Ill. App. 3d at 603.) Here, in contrast, Swanson's shotgun was only used for demonstration purposes, the jury was informed that it was not the gun responsible for Thomas' death, and the State never argued that it was defendant's gun. If, for instance, the police here had found a pistol in defendant's apartment which was subsequently introduced by the State, then *Yelliott* would be applicable since there would be no connection between the pistol and the shooting of Thomas with a shotgun. But since the gun here was only used for demonstration, the *Yelliott* rationale is inapplicable. That being the case, the usual analysis of demonstration evidence is still applicable. As discussed above, there was some relevance to the demonstration and, since the conditions of the demonstration are not impermissibly different than those of the shooting, we do not believe that the trial court erred in allowing the demonstration of Swanson's Model 97.

■ Finally, defendant argues that portions of the State's closing argument were inflammatory and not based on the evidence. Referring to a picture which showed that Thomas' zipper was down when the body was discovered, the prosecutor argued that Thomas was in

the act of relieving himself when shot. After defendant's objection to this comment was sustained, the prosecutor went on to argue that the evidence of the zipper being down showed that sex was involved in the shooting. Defendant contends that such remarks were not based on the evidence and unnecessarily drew the jury's attention to an irrelevant and inflammatory matter.

It appears that defendant has waived this argument. Although he objected at trial, he did not reassert the issue in his post-trial motion. The failure to reassert the issue in his post-trial motion waives the issue for review. (*People v. Gerrior* (1987), 155 Ill. App. 3d 949, 954.) Since we reverse and remand this case for a new trial, however, we state now that the complained-of arguments are not reasonable inferences to be drawn from the evidence, and such comments should be avoided on retrial.

For the reasons stated above, defendant's conviction is reversed, and the cause is remanded to the circuit court of Winnebago County for a new trial.

Reversed and remanded.

HOPF and UNVERZAGT, JJ., concur.

### APPENDIX A

The following occurred after Allen conferred with his appointed counsel and the State withdrew its offer of immunity:

"Q. [Mr. Gemignani]: Mr. Allen, what has been the nature of your relationship with the defendant, Mr. Pirrello?

A. We used to fish.

ATTORNEY GORDON RING: Judge, I am Gordon Ring. I have been appointed by this Court to represent Mr. Allen. At this point I would advise the Court and advise Mr. Allen that he at this time will invoke his right to the Fifth Amendment, the right to remain silent, will not answer further questions.

THE COURT: Thank you. Your answer, sir?

A. Me and Mr. Pirrello used to fish together.

ATTORNEY GORDON RING: Excuse me, Judge.

THE COURT: You do not understand, I think.

THE WITNESS: No, sir.

THE COURT: It is all right, Mr. Allen. Do you wish to invoke your right under the Fifth Amendment not to answer that question?

THE WITNESS: Yes sir.

THE COURT: Okay, all right. Let the record so show.

Q. [Mr. Gemignani]: On the 23rd of July, 1985, 7:00 a.m. were you at Calhoun's Bar?

MR. RING: Judge, again I would advise Mr. Allen not to answer that question, invoking his right to the Fifth Amendment.

THE COURT: Your answer, is that correct?

THE WITNESS: That's—

THE COURT: (Interrupting) You invoke the Fifth Amendment?

THE WITNESS: Yes, sir.

THE COURT: Mr. Gemignani?

Q. [Mr. Gemignani]: On the 23rd of July, 1985, sometime in the morning, did you have occasion to see Mark Thomas at Calhoun's Bar?

ATTORNEY GORDON RING: Again I would advise Mr. Allen not to answer that question, invoke his right to the Fifth Amendment.

THE COURT: Is that your answer?

THE WITNESS: Yes sir.

MR. PUMILIA: I would like to approach the bench.

THE COURT: Yes sir.

(Whereupon, the following proceedings were had at the bench.)

THE COURT: Okay, Gary.

MR. PUMILIA: Judge, Mr. Gemignani is just going to ask questions. I do not know what his future questions are going to tell the jury. Then the questions, within the questions themselves, I would object to that procedure, as long as the witness is continuing on his present course.

THE COURT: Objection overruled.

Mr. Gemignani—thank you, gentlemen.

(Whereupon, the proceedings were continued.)

Q. [Mr. Gemignani]: On the 23rd of July, 1985, at or around midmorning, did you have occasion to see Melissa Boma at Calhoun's Bar?

ATTORNEY GORDON RING: Again I would advise Mr. Allen not to answer this question or any questions and to invoke his right to the Fifth Amendment.

THE COURT: Is that your answer?

THE WITNESS: Yes sir.

MR. GEMIGNANI: Your Honor, if the defendant does not want to answer any questions, if the defendant refuses to an-

swer any questions, shall I proceed?

THE COURT: You may proceed.

MR. PUMILIA: Judge, I would object to his proceeding. He is just putting questions in front of the jury, implying to the jury by the questions that there are facts that he knows he is not going to get any answers to.

THE COURT: Overruled.

Q. [Mr. Gemignani]: Did you on the 23rd of July, 1985, go to the Railroad Bar?

MR. LIGHT: Objection; he is leading the witness.

THE COURT: Overruled.

MR. RING: I would advise Mr. Allen to refuse to testify.

THE COURT: Is that your answer?

THE WITNESS: Yes sir.

\* \* \*

Q. [Mr. Gemignani]: On the 23rd of July, 1985, at some time in the morning did you have occasion to see the defendant at the Railroad Bar?

ATTORNEY GORDON RING: Judge, I advise Mr. Allen not to answer under his right to the Fifth Amendment.

MR. PUMILIA: I would object to the leading form of the question. I realize it is a little unusual. I would make a request of the Court to grant the witness immunity so he can testify, so we do not hear the prosecutor's questions without any answers.

THE COURT: Overruled.

Your answer, you take the Fifth Amendment?

THE WITNESS: Yes.

THE COURT: You invoke the Fifth Amendment, I guess is the better terminology.

He invokes the Fifth Amendment, refuses to answer on the grounds it might incriminate him, is that right, Mr. Allen?

THE WITNESS: Yes.

Q. [Mr. Gemignani]: Did you on the 23rd of July, 1985, during the midmorning at the Railroad Bar discuss a drug transaction with the defendant, Pirrello?

ATTORNEY GORDON RING: Judge, I would advise Mr. Allen not to answer that question. It is his right under the Fifth Amendment.

THE WITNESS: Yes.

MR. PUMILIA: I would object to the leading form of the question, ask the question be stricken, the jury be admonished to disregard the question.

THE COURT: Overruled.

Q. [Mr. Gemignani]: Did you on that day, July 23, 1985, at or about 7:00 a.m.—I mean, I am sorry, midmorning at the Railroad Bar have a conversation with the defendant, Pirrello, about Mark Thomas?

MR. LIGHT: Objection.

THE COURT: Overruled.

ATTORNEY GORDON RING: I would advise Mr. Allen not to testify under his rights under the Fifth Amendment.

THE COURT: Your answer?

THE WITNESS: Yes.

MR. PUMILIA: Judge, could I approach the bench?

THE COURT: No.

MR. PUMILIA: Then, Your Honor, instead of our objecting to every question as we are going, we think they are leading, they are suggestive. I think we have stated our grounds. I would like on the record we have a continuing objection to any question asked of this witness.

THE COURT: Let the record so show.

Q. [Mr. Gemignani]: Did you later on in the morning appear at Calhoun's Bar?

ATTORNEY GORDON RING: I would advise Mr. Allen not to answer, invoke his rights under the Fifth Amendment.

THE COURT: Your answer?

THE WITNESS: Yes sir.

THE COURT: Is that your answer?

THE WITNESS: Yes.

THE COURT: He invokes the Fifth Amendment he says, he indicates.

Q. [Mr. Gemignani]: Did you later on that same morning see the defendant at Calhoun's Bar?

ATTORNEY GORDON RING: Judge, again I advise Mr. Allen to refuse to answer, invoke his rights under the Fifth Amendment.

THE COURT: Is that your answer?

THE WITNESS: Yes sir.

Q. [Mr. Gemignani]: Did you later on that morning engage in a conversation between yourself, the defendant, Pirrello, Mark Thomas regarding a drug transaction?

ATTORNEY GORDON RING: Again I would advise Mr. Allen not to answer, invoke his rights under the Fifth Amendment.

THE WITNESS: Yes.

THE COURT: Your answer? You are invoking the Fifth Amendment, Mr. Allen?

THE WITNESS: Yes.

Q. [Mr. Gemignani]: Did you on that day at Calhoun's Bar give any money to Mark Thomas?

MR. RING: Again I would advise Mr. Allen not to testify, invoke his right under the Fifth Amendment.

THE COURT: Is that your answer?

THE WITNESS: (Nods head affirmatively.)

Q. [Mr. Gemignani]: Did you on that day, at that time, and at that place see the defendant, Pirrello, give any money to Mark Thomas?

ATTORNEY GORDON RING: Again I advise Mr. Allen not to testify, invoke his right under the Fifth Amendment.

THE WITNESS: Yes.

THE COURT: Is that your answer?

THE WITNESS: Yes.

Q. [Mr. Gemignani]: On that day, at that time did you see the defendant and Mark Thomas leave the bar?

ATTORNEY GORDON RING: Again I would advise Mr. Allen not to testify, invoke his right under the Fifth Amendment.

THE WITNESS: That's my answer, yes sir.

Q. [Mr. Gemignani]: Did you on that day, at that time, and in that bar borrow some sunglasses from Billy Hicks?

ATTORNEY GORDON RING: Judge, again, excuse me, I would advise Mr. Allen not to testify, invoke his right under the Fifth Amendment.

THE WITNESS: Yes sir.

Q. [Mr. Gemignani]: Did you on that day, at that time, that place give sunglasses to Mark Thomas?

ATTORNEY GORDON RING: Again I would advise Mr. Allen not to testify, invoke his rights under the Fifth Amendment.

THE WITNESS: Yes sir.

THE COURT: Let the record show what Mr. Allen is saying when he says "yes sir" is not an answer to the question, but he is adopting his right that Mr. Ring expresses to him that he is not answering any of these questions put to him by Mr. Gemignani on the grounds that they might tend to incriminate him. He is invoking his constitutional rights.

Let the record show Mr. Light and Mr. Pumilia object to any questions being answered and the leading fashion by Mr. Gemignani.

MR. GEMIGNANI: That is all, Your Honor.

THE COURT: And the method, the method he is using.

MR. PUMILIA: Yes, Your Honor.

THE COURT: Gentlemen?

MR. PUMILIA: Could we have just one moment?

MR. LIGHT: Judge, seeing as Mr. Allen has not answered any of the questions, we cannot cross—examine him on anything.

THE COURT: You have no questions of the witness?

MR. LIGHT: No questions of the witness.

THE COURT: You may step down, Mr. Allen. Thank you.

THE WITNESS: Thank you.

THE COURT: Thank you, Mr. Allen.

(Witness excused.)"