2024 IL App (1st) 231053-U

Fourth Division
Filed November 7, 2024

No. 1-23-1053

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County |
| | ) | |
| v. | ) | No. 20 CR 05281 |
| | ) | |
| KYLE CARTER, | ) | The Honorable Maria Kuriakos-Ciesel, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The defendant's conviction for second-degree murder was affirmed where the trial court did not abuse its discretion by finding that a prosecutor's demonstration during rebuttal argument, which illustrated the State's theory of how the victim was positioned when he was shot, was not improper.

¶ 2   Following a jury trial, defendant Kyle Carter was found guilty of second-degree murder and sentenced to 18 years' imprisonment. On appeal, Carter contends that he was denied a fair trial because, during rebuttal closing argument, the trial court allowed the prosecutor to perform a demonstration using chairs and her own body movements to illustrate the State's theory of how the victim was positioned when Carter shot him. Because the trial court did not abuse its discretion when it allowed the demonstration, we affirm.

¶ 3                              I. BACKGROUND

¶ 4      After Carter fatally shot Victor Cervantes in the parking lot of an Aldi's grocery store on April 2, 2020, the State charged him with nine counts of first-degree murder, nine counts of armed robbery, two counts of aggravated unlawful use of a weapon, and one of count unlawful use or possession of a weapon by a felon. Just before trial, the State nol-prossed all but two counts of first-degree murder. Carter raised the affirmative defense of self-defense.

¶ 5      At trial, Lizbeth Urbina testified that, at the time of the charged shooting, she lived with Cervantes, who was her fiancé, across the street from an Aldi. Cervantes sold marijuana illicitly, and, on April 2, 2020, someone contacted him to make a purchase. Cervantes went to the Aldi across the street to meet the buyer. Urbina was upstairs watching Cervantes out of the window and was able to see the Jeep. She saw Cervantes get in the passenger's side of the Jeep. Urbina was waiting for Cervantes to call her to make sure everything was okay, but she never received a call. Urbina then heard a "boom" sound coming from the Jeep and saw two men running out of the Jeep towards Wood Street and Cermak Avenue. She testified that she saw "something" in each of their hands. When asked what she saw in the two men's hands, she mimicked the shape of a gun with her hand.[1] She stated that the objects she saw were blue. Observing the faces of the two people, she described them as having facial hair and having similar skin to her own. The record reflects that Urbina is "a light complected white female." Urbina did not see the actual shooting inside the car.

¶ 6      Urbina then went to the Aldi's parking lot and tried to get help. Urbina found Cervantes "dying on the floor." She called the police. Officer Laura Salgado was called to the scene and saw Urbina crying with blood on her hands. Urbina told Salgado that she saw two men running and described what they looked like and what they were wearing. Urbina told Salgado that she knew one of the men, Arredondo, but she did not know the other man. Salgado's body-worn camera

_____

[1]   Three months before trial, Urbina sustained a traumatic brain injury that affected her memory and thinking processes, which, at times, made word retrieval difficult. After a pretrial hearing, the court found her competent to testify, and Carter does not challenge that determination on appeal.

captured the interaction and was entered into evidence. After Urbina told Salgado what had happened, Salgado drove Urbina to 23rd Street and Wolcott Avenue. When they arrived, Urbina identified Arredondo and Carter as the men that ran out of the Jeep. At trial, she testified that she recognized Arredondo as a gang member who went by the names "Hit Man" and "Zeus." She identified Carter in court as the other man who ran out of the Jeep.

¶ 7 On cross-examination, Urbina stated that Cervantes sold marijuana by posting pictures of it on Snapchat. Urbina was aware that the deal Cervantes had made was for $3000 of marijuana and that he did not have $3000 worth on him when he left to meet the buyer.

¶ 8 Cynthia del Toro testified that she was shopping at Aldi when she noticed a man standing over another man, who was slumped onto his back on the ground, and aiming the gun at him. There was another person standing next to the car's front left side. After the shooting, Del Toro gave the man on the ground CPR and assistance before EMS came.

¶ 9 Jan Ortega testified that he was employed by the Aldi store as a security guard. On April 2, 2020, he heard a loud "bang" at about 5:15 p.m. and turned to face the parking lot. He noticed someone lying on the ground near a Jeep or a truck attempting to get on his feet. The man had left "a lot of money" and a pool of blood on the ground. Another man got out of the vehicle and started searching the person on the ground. Ortega attested that the individual was in possession of a silver weapon, characterizing it as a semiautomatic. Ortega stated that the individual with the silver gun was wearing a gray hoodie.

¶ 10 Salvador Garcia, another Aldi customer, testified that a "loud pop or bang" startled him as he was pulling out of the parking lot. While driving towards the exit, he saw a man fall out of a nearby car onto his back. The man did not have a weapon, but Garcia noticed blood around him. He also saw cash being scattered by the wind. Garcia then saw a different man exit from the back passenger door. Garcia described the second man as having a small build, having light skin, and wearing a gray jogging suit. The second man looked at Garcia for a moment and then started "fumbling around in their pockets." Between the blood, the cash, and the search of the victim's pockets, Garcia decided to drive away. Later, after reporting what he witnessed to an officer, Garcia

identified the man who exited from the rear door in a still frame taken from security footage inside the Aldi.

¶ 11    Chicago police officer Casimir Janus testified that, after receiving a call about the shooting, he and his partner started searching the area for two suspects, including one wearing a gray hoodie. While driving northbound on Wolcott Avenue just north of Blue Island Avenue, he spotted Carter and another man at the mouth of an alley. Carter, who was wearing a gray hoodie, and the other man fled in different directions: Carter ran north along Wolcott, while the other man ran into the alley. Janus and his partner chased Carter, apprehending him about half a block north of the alley. When they frisked him, they discovered "a large amount of" cash in his pocket, later determined to be $2295 in a variety of denominations.

¶ 12    Josh Russell testified that he lived in the 1800 block of West 23rd Street. He heard vehicles speeding down his street and peered out the front door. From there, he could see straight ahead and spotted two men in his neighbor's gangway, about thirty feet distant on the right side of his own home. When police officers came, Russell led them to his neighbor's house.

¶ 13    Chicago police officer Frank Bogatitus testified that, at around 5:00 p.m. on April 2, 2020, he responded to a call of a person shot at the Aldi and found the unconscious victim on the ground with a gunshot wound to the chest. After receiving a flash message that two suspects wearing gray hoodies had been seen heading west on Cermak Road, Bogatitus and his partner got back in their car and started looking for the suspects. They were directed by other officers to an alley near Wolcott Avenue and Blue Island Avenue, where another person pointed them to the second house off the alley. Bogatitus and other officers started searching the house, and he found Arredondo hiding behind a door on the top floor.

¶ 14    Chicago police sergeant Karl Kruger testified that, while assisting the search for the offenders, he went into a house that was under renovation or construction in the 1800 block of West 23rd Street and found Arredondo hiding on the top floor. Arredondo was taken into custody. Later, while retracing the path he suspected Arredondo had taken to the house, he spotted what looked like a gun on the roof of a nearby tire-repair shop. Firefighters came and set up a ladder for

him to climb up to the roof. When he did, he found two handguns, a cell phone, and a key fob with a key attached. The first weapon was a green Glock with an extended magazine. The second handgun recovered was a silver and black Smith & Wesson.

¶ 15    Chicago police sergeant Kevin Norris, a supervisor in the forensic service section, testified that he responded to the Aldi, where an officer redirected him to a tire-repair shop at 2340 South Blue Island Avenue. On top of the garage, he found a cellphone, a key fob, a silver and black Smith & Wesson handgun, and a green handgun with an extended magazine. After returning to the Aldi, he searched a Jeep and found a fired bullet under or near the gas pedal, a fired bullet near the rear seat on the driver's side, and a fired cartridge case beneath the front passenger seat.

¶ 16    Dr. Kristin Escobar Alvarenga of the Cook County Medical Examiner's Office testified that, on April 3, 2020, she performed a postmortem examination of Cervantes' body and determined he had two perforated gunshot wounds. The first shot entered through his upper back and exited from the part of his chest "overlying" his left collarbone. Just below the angle of the jaw, the second bullet entered Cervantes' neck through the upper lateral left side and exited the lower left side of his face. Dr. Escobar Alvarenga concluded that Cervantes died from multiple gunshot wounds and classified the manner of death as homicide.

¶ 17    Illinois State Police firearms analyst Gregory Bate testified that, after comparing the two guns recovered from the tire-repair shop roof with the bullets and the cartridge case found in the Jeep, he concluded that the bullets and the cartridge case had all been discharged from the Smith & Wesson.

¶ 18    Chicago police detective Chad Behrend testified that, on April 2, 2020, he took samples from Carter and Arredondo for gunshot-residue (GSR) kits.

¶ 19    Illinois State Police forensic analyst Shan Mei Jones testified that she analyzed the kits. She found GSR particles in Carter's kit, indicating that he had either fired a gun, made contact with a GSR-related object, or had his left hand near a discharged firearm. She did not find GSR particles in Arredondo's kit, indicating that he either likely had not discharged a firearm or, if he

had, that the particles were either not deposited, eliminated by activity, or not picked up by the test.

¶ 20    The only witness the defense called was Carter. He testified that he worked part-time as a forklift operator and sold marijuana "on the side" so he could pay his bills. He acknowledged that he had previously been convicted of unlawful possession of a firearm and aggravated battery involving the discharge of a firearm. On April 2, 2020, Carter went to his friend Paul's house to sell him marijuana. Arredondo, who was a friend of Paul's, was also there. Carter knew Arredondo as "Hitman the Great" and had sold marijuana to him before. Arredondo told Carter that he and his business partner "Snake" could sell Carter a pound of marijuana for $2200. Figuring that he would be able to resell it for $2700, Carter agreed to meet with Snake, who he later learned was Cervantes.

¶ 21    Arredondo called Snake and then drove Carter to an Aldi parking lot. They drove in Arredondo's Jeep. Carter brought a gun with him for protection, and he identified the photo of the Smith & Wesson later found on the roof of the tire-repair shop as his. When Arredondo and Carter arrived, Cervantes was not there yet, so Carter went inside to buy flowers. Before he could make a purchase, though, Arredondo called him and told him that Cervantes had arrived. Carter left the store, went back to the Jeep, and got in the back seat, behind Cervantes. Cervantes gave him two sample jars containing two different strains of marijuana. Carter picked one and handed the money to Cervantes, who said that he would count it out and then call his girlfriend to bring the marijuana to the car. Carter sat back to wait.

¶ 22    Suddenly, Cervantes turned around, put a gun in his face, and said, "[D]on't fucking move. You are not getting shit. Don't move." Afraid that Cervantes meant to kill him, Carter told Cervantes to calm down. Arredondo looked up from his phone and asked Cervantes what he was doing, prompting Cervantes to look away from Carter. At that point, Carter, afraid that Cervantes would kill him, pulled his own gun out from the pocket of his hoodie and, without taking the time to aim, fired a single shot.

¶ 23    Cervantes fell out of the car. The money Carter had given to him to count "flew everywhere." Carter got out and told Cervantes not to move. Cervantes replied, "I'm not moving,

I'm not moving." Carter gathered the money he was able to and ran out of the parking lot with Arredondo. He explained at trial that he fled rather than going to the police because he was a convicted felon carrying a gun during an illegal drug deal. They found themselves in a backyard, and Arredondo asked him, "[W]hat did you do?" After Arredondo took Carter's gun from him, Carter decided that he just wanted to leave, so he walked away, leaving Arredondo with the gun.

¶ 24    After the defense rested, the State called Arredondo in rebuttal. Arredondo testified that he drove himself and Carter to the Aldi in the Jeep to purchase marijuana from Cervantes. During the transaction, Carter sat in the back seat behind Cervantes, Arredondo was behind the wheel, and Cervantes was in the passenger seat. Arredondo did not have a gun. Carter's money was in a cupholder, and Cervantes started counting it. Cervantes counted the money by separating the bills and placing the money on his lap. Arredondo stated that Cervantes turned to put the money in the "cubby space" in the door. Carter said, "This is the last time." Carter pulled out his gun, cocked it, and shot Cervantes. Arredondo stated that Cervantes did not brandish or threaten Carter with a gun. Carter then jumped out of the Jeep and started picking things up; Arredondo was not sure if it was money or shell casings. Carter stood over Cervantes' body and tried to shoot Cervantes again, but the gun was not working. Carter picked up Cervantes' gun and gave it to Arredondo. Arredondo and Carter ran out of the parking lot, leaving the Jeep behind. While running away, Carter told Arredondo he shot Cervantes because Cervantes was trying to rob him. Arredondo and Carter threw the guns onto the roof of a garage as they ran down an alley. Arredondo denied that he threw a cell phone on to the roof.

¶ 25    Before closing arguments, the defense asked to use flowers as a "demonstrative exhibit" to illustrate that Carter was thinking about the flowers before the shooting, which showed that he had not come to the transaction with "a malic[ious] heart." The State objected on the grounds of relevance. Noting that Carter had only mentioned flowers and no flowers were introduced into evidence or depicted on the parts of the video that were shown to the jury, the court denied the request.

¶ 26    During closing argument, defense counsel argued that Carter had not gone to the deal intending to kill anybody and that he had only shot Cervantes in self-defense. Counsel blamed Cervantes's death on his own reckless, heartless, and cruel attempt to rob Carter.

¶ 27    During rebuttal, the prosecutor argued that the forensic evidence refuted Carter's claim that Cervantes pulled a gun on him and told him not to move. To illustrate, while holding a photograph of the Jeep that had been entered into evidence, she repositioned two chairs in the courtroom to stand in for the driver's seat and the front passenger seat:

> "Here's (indicating) the driver's seat of the car. You're in the backseat.[2]
>
> Here's (indicating) Israel [Arredondo]. Here's (indicating) Victor [Cervantes] and back here is the defendant."

She began describing the State's theory of what happened inside the Jeep:

> "The defendant hands Israel the money and Israel's got his back to him—excuse me—hands Victor the money and Victor's got his back to him and Victor's counting the money out, like Israel said. And think about that. You know that's true. Ain't no drug dealer on the face of this planet who's going to take either side at their word for how much cash is in that pile.
>
> Victor's counting it out and as Israel said, he's putting it in piles, and as he's running out of room for the piles, he goes to put it in the door."

At that point, the defense objected "because the State objected to our using things that weren't in evidence." The court overruled the objection. The defense then moved for a mistrial, which the court denied. The prosecutor continued her description:

> "Okay. Well, this is the left side of the door. Okay? But you're going to get all the pictures in the back. You can see it in this picture right by the little cup, little cubby, as Israel described it, hole, whatever you want to describe

---

2    It is not clear from the record who the prosecutor was referring to as being in the back seat.

that little container in the door. It's right under the door[ ]handle, right? It's right under the door[ ]handle.

So Victor is trying to get this transaction over with, counting the piles, goes to put it here by the door[ ]handle and he made a fast movement when he did that. What's he thinking back here?

Dude, taking off with my money. He's back here; Israel turns over—*** boom."

Defense counsel interjected, "Judge[,] *** for the purpose of the record, counsel's sitting on the very end of the seat and not describing anything that the evidence, in fact, was testified to." The court admonished the jury that what the attorneys said during closing argument was not evidence. The prosecutor continued, arguing that Carter shot Cervantes because he thought Cervantes was trying to run off with the money. She then contended that the postmortem examination contradicted Carter's story because it showed exactly how Cervantes was positioned when he was shot:

"The minute Victor went to put those in that side compartment, [Carter] thought he was reaching for the door, and he was jumping out and running, and he shot him before he could do that.

We know he did because he shot [Cervantes] in the back, shot in the back, and according to Dr. Escobar, [the shot] came out the front of his chest, and according to Dr. Escobar, likely re-entered his neck and went out through his cheek. She said the trajectory lines up perfectly.

So he's sitting like this (indicating) right out the back—"

As the prosecutor demonstrated the State's theory about how Cervantes was positioned when he was shot, the defense again objected and moved for a mistrial, explaining that it was "the second time that counsel has sat differently" and that the demonstration was "beyond evidence." The court denied the motion for a mistrial and again instructed the jury that what the attorneys said during closing argument was not evidence. The prosecutor then concluded her argument in rebuttal:

"In his back out his chest in his neck and out his cheek because [Carter] thought he was being robbed. And that's what the evidence shows you and that is the credible story here, ladies and gentlemen.

We are asking you to find him guilty of first-degree murder \*\*\*. Thank you."

The defense immediately asked for a sidebar. The court said that it would "take up whatever you wish" once it had finished instructing the jury.

¶ 28 After the jury began deliberations, the court gave the defense its opportunity to be heard about the State's demonstration. The defense argued that there was no evidentiary foundation for the demonstration and that the prosecutor had essentially, and improperly, taken on the role of a witness by "sit[ting] on the very edge of the chair and go[ing] through gyrations" that were not supported by the evidence, and it renewed its motion for a mistrial. The prosecutor who had performed the demonstration acknowledged that she had not sought advance permission for the demonstration because she was acting on the spur of the moment, but she maintained that the demonstration was based on the evidence and "set up the theory of our case based on the evidence." The court described the demonstration as "highly disrespectful" to the court and observed that the defense "had every right at that time to object," but it explained that it had not wanted "to disrupt the arguments for the jury to go into a sidebar at that time." However, the court noted that it had instructed the jury that closing arguments were not evidence, and it found that the demonstration had, in fact, been based on the evidence: "[T]here were seats in the car mentioned, there were pictures of seats and; therefore, it's not like pulling something out of the sky like these flowers that you know never was shown to put a demonstration in front of the jury." Between that and the court's instructions to the jury, the court denied the defense's motion for a mistrial.

¶ 29 The jury found Carter guilty of second-degree murder.

¶ 30 Carter filed a motion for a new trial and a supplemental motion for a new trial, claiming that the trial court erred in denying a mistrial when the State utilized a demonstrative that was not supported by the evidence and added an opinion that was not supported by the evidence at closing.

In denying a new trial, the court again emphasized that it had repeatedly instructed the jury that closing arguments are not evidence and that the demonstration had been based on the evidence:

"Okay. *** [F]irst of all, this Court addresses the jury in terms of instructions as well as giving them the written instructions that tell them what is said during closing arguments is not evidence and it should not be considered by them as evidence. They've been told that from the beginning. They're given those instructions. So this Court is confident that this jury follows through with those instructions.

Secondly, what the demonstration was *** based on [was] what was given as evidence. Perhaps it is interpretation in how—it was not something that was pulled out from the air. It was based on the evidence presented at trial. So how it's interpreted by each side is how—is what argument is all about.

So what she did was, through demonstration, argued her side of the case. ***

* * *

The chairs were—these particular chairs were not mentioned, but chairs in a car were mentioned. So I find what the State did, *** it was within what was stated."

The court also found that, even if the demonstration had been improper, it was harmless.

¶ 31    After denying a new trial, the court sentenced Carter to 18 years' imprisonment.

¶ 32                              II. ANALYSIS

¶ 33    On appeal, Carter argues that the State's demonstration during closing argument denied him his right to a fair trial. He contends that the demonstration was inappropriate because it misrepresented the evidence, overemphasized Arredondo's testimony, and failed to elucidate the witnesses' testimony regarding the positions of the Jeep's occupants.

¶ 34    "The purpose of closing arguments is to provide the parties with a final opportunity before the jury to review the admitted evidence, to explain the relevant law, and to assert why the evidence and the law compel a favorable verdict." *People v. Williams*, 2022 IL 126918, ¶ 40. Because arguments are not evidence, "[a]n error in closing argument is not a typical trial error." *Id.* ¶ 40. Allegations that the trial court erroneously overruled objections to a prosecutor's conduct during closing argument are reviewed using "a unique two-step process." *Id.* ¶ 41. First, we determine whether the conduct in question was improper. *Id.* If it was, we then determine whether the improper conduct "was so prejudicial that real justice was denied or the verdict resulted from the error." *Id.*

¶ 35    Contrary to Carter's perfunctory argument that review is *de novo*, it has long been settled that "questions involving the conduct of counsel at the trial, and the character and scope of their arguments to the jury, must be left very largely to the sound discretion of the trial judge." *North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486, 502 (1892); *accord People v. Byron*, 164 Ill. 2d 279, 295 (1995) ("The regulation of the substance and style of the closing argument is within the trial court's discretion."). Hence, we do not ask whether we would have allowed the demonstration at issue to take place. Instead, the question is whether the trial court, which was "in a far better position than this court to evaluate a particular demonstration," abused its discretion by allowing it to go forward. *Dowds*, 253 Ill. App. 3d at 957. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 36    In general, courts afford attorneys "wide latitude" during closing argument to comment on the evidence and suggest the inferences that can be drawn from it. *Williams*, 2022 IL 126918, ¶ 44. When it comes to demonstrations, case law discloses two basic guardrails. First, just like verbal arguments, demonstrations must be "based on the evidence at trial." *People v. Malone*, 211 Ill. App. 3d 628, 640 (1991). Second, a demonstration should only be used to help the jury understand the testimony, " 'not for dramatic effect.' " *People v. Dowds*, 253 Ill. App. 3d 955, 957 (1993)

(quoting *People v. Harp*, 193 Ill. App. 3d 838, 843 (1990)). With those limits in mind, we consider the trial court's evaluation of the demonstration in this case.

¶ 37     First, it was not unreasonable for the trial court to find that the prosecutor's demonstration was based on the evidence. See *Malone*, 211 Ill. App. 3d at 640. While performing the challenged demonstration, the prosecutor rearranged chairs to represent the seats in the Jeep, sat in the chair representing the front passenger's seat, and moved her body to illustrate the State's theory of how Cervantes was positioned when he was shot. All of this was based on evidence. The arrangement of the chairs was based on the interior of the Jeep, photographs of which were introduced into evidence. Carter and Arredondo both testified that Cervantes sat in the front passenger seat, Arredondo sat in the driver's seat, and Carter sat in the back seat, behind Cervantes. Arredondo testified that, while counting money, Cervantes turned toward the door, apparently to put some of the bills in a "cubby space" by the door handle. Dr. Escobar Alvarenga testified that, based on her postmortem examination, the two distinct sets of gunshot injuries Cervantes sustained could have been caused by a single bullet that first entered his upper back with an upward trajectory, exited from his upper chest, entered again just below the jawline, and finally exited through the left side of his face.

¶ 38     Because the chair arrangement did not precisely reflect the Jeep's inside dimensions and because the prosecutor moved around in the chair in a way that defense counsel believed was not supported by the evidence, Carter argues that the demonstration was dissimilar to the actual circumstances inside the Jeep at the time of the shooting. Variations between the conditions of a demonstration and the incident it seeks to recreate, however, do not make the demonstration improper if the differences are not substantial. See *People v. Pirrello*, 166 Ill. App. 3d 614, 623 (1988) (finding that, "despite the differences defendant points to, it does not appear that the guns were so substantially different in any relevant characteristic so that the demonstration was error *per se*"). During the demonstration, defense counsel twice—in open court, in front of the jury— brought to the attention of the trial court that, in her view, the prosecutor was sitting in one of the chairs in a manner not shown by the evidence. The trial court, which was able to see for itself what

the prosecutor was doing, allowed the demonstration to continue after reminding the jury that closing arguments were not evidence.

¶ 39     The trial court could have also reasonably determined that the prosecutor's demonstration was, on balance, more helpful than prejudicial. Carter argues that there was no need for the demonstration because the testimony given during trial was clear regarding where the individuals were seated in the car. The point of the demonstration, though, was not merely to depict where people were sitting in the Jeep. The primary issue at trial was whether Carter acted in self-defense when he fired his weapon at Cervantes. During rebuttal argument, the State contended that Carter's self-defense claim was not credible because the evidence from Cervantes's autopsy showed that he was shot from behind while—consistent with Arredondo's testimony—turning toward the door and putting money in the cubby hole near the door handle. To help her convey that theory to the jury, the prosecutor illustrated her argument by physically showing the jury what she meant. Although oratory is the traditional method used to deliver closing argument, the law does not limit attorneys to the spoken word, and concepts that are difficult to convey using language might be more easily communicated and understood by showing, not telling. Here, it would not be unreasonable for the trial court to determine that the prosecutor's demonstration could help the jury better understand the State's theory.

¶ 40     Carter next contends that the demonstration unfairly memorialized and unduly emphasized Arredondo's testimony. Again, the trial court could reasonably think otherwise. The demonstration did not "memorialize" any testimony or evidence any more than a purely verbal argument would have. Unlike the demonstrative exhibits in the cases that Carter cites, the demonstration was not captured using some sort of medium that would preserve it for future display or reference. See *People v. Williams*, 161 Ill. 2d 1, 66-69 (1994) (finding prejudicial error from use of eight-foot-tall chart that merely repeated witness testimony about the defendant's criminal record); *People v. Kinion*, 105 Ill. App. 3d 1069, 1076-77 (1982) (holding that trial court abused its discretion by allowing prosecution to use, during examination of expert witness, a chart that merely summarized the expert's opinion testimony). And although the demonstration certainly emphasized

Arredondo's testimony and the evidence derived from the postmortem examination, that is a feature of all closing arguments. Emphasis is a problem only when it is undue, and the demonstration emphasized evidence going to the central issue at trial, which was whether Carter shot Cervantes in self-defense. With that in mind, it would not be unreasonable to believe that it was entirely appropriate for the prosecutor to emphasize the evidence supporting the State's theory that Carter shot Cervantes from behind to stop him from stealing money.

¶ 41 Finally, Carter cites several cases where reviewing courts have upheld trial-court rulings disallowing certain demonstrative evidence. *E.g. People v. Singmouangthong*, 334 Ill. App. 3d 542, 549 (2002) (holding that trial court did not abuse its discretion because it reasonably concluded that the proposition being illustrated was so simple that no further illustration was necessary); *Rafea v. Brown*, 2021 IL App (2d) 200307-U, ¶¶ 31-37 (holding that trial court did not abuse its discretion by prohibiting plaintiffs in car-accident trial from using video of unrelated crash that occurred in different manner than the collision at issue). Under the circumstances presented, a different judge may not have permitted the State to continue its demonstration once the defense objected. The question on appeal, though, is not whether a different judge would have allowed the State to illustrate its theory through a courtroom demonstration during rebuttal argument. We are reviewing for an abuse of discretion. Our task is to determine only whether the trial court's decision to allow the demonstration to continue fell within the wide scope of sound discretion it had to regulate closing argument. Where reasonable judges can disagree about whether the State should have been allowed to continue its demonstration, we may "not second-guess the trial court's determination." *Dowds*, 253 Ill. App. 3d at 957. Because we find that the trial court's determination here was within the bounds of reason, we hold that it did not abuse its discretion.

¶ 42                                    III.  CONCLUSION

¶ 43 The trial court did not abuse its discretion by finding that the prosecutor's demonstration was within the proper bounds of conduct during closing argument. Accordingly, it properly denied Carter's motion for a mistrial and his motion for a new trial, and we affirm his conviction.

¶ 44    Affirmed.